Barbara J. Parker (SBN 69722)
OAKLAND CITY ATTORNEY
One Frank H. Ogawa Plaza, 6th Floor
Oakland, CA 94612
Telephone: (510) 238-6512

Yosef Peretz (SBN 209288)
PERETZ & ASSOCIATES
22 Battery Street, Suite 202
San Francisco, California 94111
Telephone: (415) 732-3777
Facsimile: (415) 732-3791

Joel Liberson (SBN 164857)
TRIAL & APPELLATE RESOURCES, P.C.
400 Continental Blvd., 6th Floor
El Segundo, CA 90245
Telephone: (917) 848-3218

Robert S. Peck (*pro hac vice* pending*)*
CENTER FOR CONSTITUTIONAL LITIGATION
777 6th Street NW, Suite 520
Washington, DC 20001
Telephone: (202) 944-2803

Attorneys for Plaintiff CITY OF OAKLAND

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY OF OAKLAND, a municipal Corporation,<br><br>               Plaintiff,<br><br>vs.<br><br>WELLS FARGO & CO., and WELLS FARGO BANK, N.A.,<br><br>               Defendants. | Civil Case No.<br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL** |

## I.    NATURE OF THE ACTION

1.    Plaintiff City of Oakland ("Oakland" or the "City") brings this action against Wells Fargo & Co., Inc. and Wells Fargo, N.A. (hereafter "Wells" or the "Bank") for the economic impact of its longstanding, unbroken policy and practice of steering minority borrowers in Oakland into mortgage loans offered on "predatory" terms (defined herein as terms that have higher costs and risk features than more favorable and less expensive loans for which the borrower was eligible and which are regularly issued to similarly situated white borrowers) and for its policy of refusing to extend credit to minority borrowers who desired to refinance the more expensive loans they previously received when such credit was extended to white borrowers.

2.    The adverse impact that the Bank's mortgage lending policies and practices would cause in terms of widespread economic and non-economic damages throughout the City were entirely foreseeable, *inter alia*,  through a variety of analytical tools and published reports available to the Bank.

3.    This suit is brought pursuant to the Fair Housing Act of 1968 ("FHA"), as amended, 42 U.S.C. §§ 3601, *et seq*., and the California Fair Employment and Housing Act ("FEHA"), California Government Code ("Gov't Code") §12900, *et seq.*,  by the City to seek redress for injuries caused by Wells Fargo's pattern or practice of illegal and discriminatory mortgage lending. Specifically, Oakland seeks injunctive relief and damages for the injuries caused by (1) the origination of mortgage loans on predatory terms in minority neighborhoods and to minority borrowers that are the result of Wells Fargo's unlawful and discriminatory lending practices, and (2) the Bank's subsequent refusal to extend credit to minority borrowers seeking to refinance previously issued unnecessarily expensive loans. The unlawful conduct alleged herein

consists of both intentional discrimination and disparate impact discrimination. Wells Fargo's policies and practices identified herein were not justified by business necessity or legitimate business interests. There were less costly and thus less discriminatory alternatives available to Wells Fargo that would have achieved the same business goals as were achieved by these policies and practices.

4.      While Wells has adapted to changing market conditions necessitated by enhanced public scrutiny of its mortgage lending practices, one issue has remained constant since at least 2004 – Wells has systematically engaged in a continuous pattern and practice of steering minority borrowers in Oakland into mortgage loans with predatory terms when more favorable and less expensive loans were being offered to similarly situated non-minority borrowers. This unlawful pattern and practice continues through the present and has not terminated. Therefore, the operative statute of limitations governing actions brought pursuant to the FHA and FEHA has not commenced to run.

5.      Wells Fargo's discriminatory lending practices knowingly place vulnerable, underserved borrowers in loans they cannot afford. The practices maximize Wells Fargo's profits without regard to the borrower's best interests, the borrower's ability to repay, or the financial health of underserved minority neighborhoods, resulting in an excessively high number of more expensive loans in Oakland.  Moreover, Wells Fargo has averted any significant risk to itself by selling the vast majority of mortgage loans it originates or purchases on the secondary market.

6.      The pattern and practice of lending discrimination engaged in by Wells Fargo consists of traditional redlining[1] and reverse redlining,[2] both of which

---

[1] Redlining is the practice of denying credit to particular neighborhoods based on race.

[2] Reverse redlining is the practice of flooding a minority community with exploitative loan products.

have been deemed to violate the FHA and FEHA. Wells Fargo engaged in redlining, and continues to engage in said conduct, by refusing to extend mortgage credit to minority borrowers in Oakland on equal terms as to non-minority borrowers. Wells Fargo engaged in reverse redlining, and continues to engage in said conduct, by extending mortgage credit on predatory terms to minority borrowers in minority neighborhoods in Oakland on the basis of the race or ethnicity of its residents.

7.     Wells Fargo's discriminatory misconduct has also caused an excessive and disproportionately high number of foreclosures in the minority neighborhoods of Oakland. These foreclosures often occur when a minority borrower who previously received a predatory loan sought to refinance the loan, only to discover that Wells Fargo refused to extend credit at all, or on equal terms as refinancing similar loans issued to white borrowers. The inevitable result of the combination of issuing unnecessarily expensive or inappropriate loans, and then refusing to refinance the loans, was foreclosure.

8.     Wells Fargo would have had comparable rates of issuing predatory loans and resulting foreclosures in minority and white communities within Oakland if the Bank was properly and uniformly applying responsible underwriting practices in both communities. Wells Fargo possesses sophisticated underwriting technology, analytic tools, data, and access to reports that allow it to foreseeably predict with precision the likelihood that it had issued an improperly more expensive loan, as well as the likelihood the loan would result in delinquency, default or foreclosure.[3]   And if that were  not sufficient, the Bank had branch

---

[3] The scope of Wells' risk analysis policies and practices is set forth in detail throughout the Bank's 2014 Annual Report at https://www08.wellsfargomedia.com/assets/pdf/about/investor-relations/annual-reports/2014-annual-report.pdf.

offices located in Oakland and knew, or certainly should have known, of the adverse consequences of its lending misconduct to minority borrowers and the City regardless of whether the Bank subsequently sold the loan or servicing rights to a third party.   Consequently, the Bank's issuance of improperly more expensive loans to minority borrowers and the consequent foreclosures or other financial pressures that resulted in deterioration of the property were foreseeable, evident, and not the result of random, superseding events.

9.     While Wells purports to be a good corporate and community citizen, the reality is exactly the opposite.  The Bank was putting its financial interests ahead of its customers and the City of Oakland in order to maximize profits.

10.     According to former Federal Reserve Chairman Ben Bernanke, "foreclosures can inflict economic damage beyond the personal suffering and dislocation that accompany them. Foreclosed properties that sit vacant for months (or years) often deteriorate from neglect, adversely affecting not only the value of the individual property but the values of nearby homes as well. Concentrations of foreclosures have been shown to do serious damage to neighborhoods and communities, reducing tax bases and leading to increased vandalism and crime. Thus, the overall effect of the foreclosure wave, especially when concentrated in lower-income and minority areas, is broader than its effects on individual homeowners."[4]

11.     The discriminatory lending practices at issue herein have resulted in what has been described as the "greatest loss of wealth for people of color in

---

[4] Remarks by Federal Reserve Chairman Ben Bernanke at the Operation HOPE Global Financial Dignity Summit, Atlanta, Georgia at pg. 4 (November 15, 2012) available at www.federalreserve.gov/newsevents/speech/bernanke20121115a.htm.

modern US history."[5] It is well-established that poverty and unemployment rates for minorities exceed those of whites, and therefore, home equity represents a disproportionately high percentage of the overall wealth for minorities.[6] As Bernanke recently explained, as a result of the housing crisis, "most or all of the hard-won gains in homeownership made by low-income and minority communities in the past 15 years or so have been reversed."[7] The resulting impact of these practices represents "nothing short of the preeminent civil rights issue of our time, erasing, as it has, a generation of hard fought wealth accumulation among African-Americans."[8]

## II.    PARTIES

12.    Plaintiff City of Oakland is a municipal corporation organized pursuant to Article XI of the California Constitution and provides the usual variety of services to its residents and visitors as do other municipalities, including police and fire services.

13.    The City also has a long history of promoting and seeking to maintain a diverse, stable, and integrated community.  These objectives are achieved through the active involvement of the City's elected officials and numerous City Agencies and Departments.  For example, the Oakland Housing and Community Development Division of the City's Community and Economic Development

---

[5] United for a Fair Economy, Foreclosed: State of the Dream 2008, at v (Jan. 15, 2008), available at http://www.faireconomy.org/files/StateOfDream_01_16_08_Web.pdf.

[6] Robert Schwemm and Jeffrey Taren, *Discretionary Pricing, Mortgage Discrimination, and the Fair Housing Act*, 45 HARVARD CIVIL RIGHTS-CIVIL LIBERTIES LAW REV. 375, 382 (2010).

[7] Bernanke, *supra* n.4, at p. 3.

[8] Charles Nier III and Maureen St. Cyr, *A Racial Financial Crisis: Rethinking the Theory of Reverse Redlining to Combat Predatory Lending Under the Fair Housing Act*, 83 TEMPLE LAW REVIEW 941, 942 (2011).

Agency promotes access to decent affordable housing in healthy, sustainable neighborhoods with full access to life-enhancing services. It works with participating lenders to assist low and moderate-income, first-time homebuyers purchase homes in Oakland through its Mortgage Assistance Program ("MAP"), its "Shared Appreciation Mortgage" program, and its CalHome Program to purchase homes in Oakland.

14.    Wells Fargo & Company is a nationwide, diversified, financial services company.  Upon information and belief, its corporate headquarters are located in San Francisco, California. It is the parent company of Wells Fargo Bank, N.A.

15.    Wells Fargo Bank, N.A. is organized as a national banking association under the laws of the United States. Upon information and belief, its corporate headquarters are is located in South Dakota. It maintains multiple offices in the State of California and the City of Oakland for the purposes of soliciting applications for and making residential mortgage loans and engaging in other business activities.

16.    The Defendants in this action are, or were at all relevant times, subject to California state laws governing fair lending, including FEHA, which prohibits financial institutions from discriminating on the basis of race and national origin in providing financial assistance for the purchase of housing, California Government Code § 12955(e); and makes discriminating on the basis of race and national origin in making available, or in the terms and conditions of, residential real estate-related transactions a violation of California Government Code § 12955(i).

17.    The Defendants in this action are or were businesses that provide financial assistance for the purchase of housing and engage in residential real estate-related transactions in the City of Oakland within the meaning of FEHA.

18.     Based on information reported pursuant to the Home Mortgage Disclosure Act, in addition to loans that Defendants originated directly, Defendants are responsible for residential home loans acquired from, and/or sold by or through, Wells Fargo Financial, Wells Fargo Funding, Inc., Wachovia Mortgage, FSB, Wachovia Bank, N.A., Wachovia Mortgage Co., World Savings Bank, FSB, American Mortgage Network, Inc., and Home Services Lending, LLC.

19.     Upon information and belief, the City alleges that each of the Defendants was and is an agent of the other Defendants. Each Defendant, in acting or omitting to act as alleged in this Complaint, was acting in the course and scope of its actual or apparent authority pursuant to such agencies, and/or the alleged acts or omissions of each Defendant as agent were subsequently ratified and adopted by each agent as principal. Each Defendant, in acting or omitting to act as alleged in this Complaint, was acting through its agents, and is liable on the basis of the acts and omissions of its agents.

## III.    JURISDICTION AND VENUE

20.     This Court has original jurisdiction over the City's claims because it is based on a federal statute, FHA.  This Court has supplemental jurisdiction over the Gov't Code claims and other California state claims brought herein pursuant to 28 U.S.C. §1367.

## IV.    VENUE

21.     Venue is proper in the United States District Court, Northern District of California, pursuant to the FHA, because Defendants conduct business in this district, because the City is located in this district, and a substantial part of the events and omissions giving rise to the City's claims occurred in this district.

# V.    WELLS ENGAGED IN DISCRIMINATORY LENDING PRACTICES

## A.    Specific Unlawful Lending Practices

22.    Wells Fargo engaged in numerous discriminatory lending practices during the time periods at issue herein. A partial list of these practices include, but is not limited to, the following:

a.    failing to adequately monitor the Bank's policies and practices regarding mortgage loans, including but not limited to originations, marketing, sales, and risk management;

b.    reverse redlining;

c.    placing borrowers in predatory loans even though they qualify for prime loans on better terms;

d.    failing to prudently underwrite hybrid adjustable-rate mortgages ("ARMs"), such as 2/28s and 3/27s;[9]

e.    failing to prudently underwrite refinance loans, where borrowers substitute more unaffordable mortgage loans for existing mortgages that they are well-suited for and that allow them to build equity;

f.    allowing mortgage brokers to charge "yield spread premiums" for qualifying a borrower for an interest rate that is higher than the rate the borrower qualifies for and can actually afford;

g.    failing to underwrite loans based on traditional underwriting criteria such as debt-to-income ratio, loan-to-value ratio, FICO score, and work history;

---

[9] In a 2/28 ARM, the "2" represents the number of years the mortgage will be fixed over the term of the loan, while the "28" represents the number of years the interest rate paid on the mortgage will be variable. Similarly, in a 3/27 ARM, the interest rate is fixed for three years and variable for the remaining 27-year amortization.

h.    requiring substantial prepayment penalties that prevent borrowers whose credit has improved from refinancing their subprime loan to a prime loan;

i.    charging excessive points and fees that are not associated with any increased benefits for the borrower;

j.    creating a compensation scheme incentivizing employees to steer minority borrowers into predatory loans; and

k.    redlining.

**B.    Wells Intentionally Discriminated Against Minority Borrowers in Violation of the FHA and FEHA as Demonstrated by Former Bank Employees**

23.    Confidential Witnesses ("CWs") are former Wells Fargo employees familiar with the Bank's lending and business practices pertinent to the instant lawsuit in the greater Oakland region. CWs describe how Wells Fargo has targeted minorities and residents of minority neighborhoods in and around Oakland for more expensive mortgage loans.

24.    CW1 worked for Wells Fargo from 2006 to 2011 as a bank teller in the Emeryville and Fruitvale Avenue branches.

25.    CW2 worked for Wells Fargo from approximately March 2012 to August 2014 as a loan processor at the Bank's processing center in San Leandro as well as in the REO Department.

26.    CW3 worked for Wells Fargo from approximately February 2011 to February 2012 as a mortgage consultant in Oakland.

### i.    Wells Fargo targets minorities for predatory loan terms

27.    CW 1 said that sales quotas for the Fruitvale branch, which had a particularly high number of minority customers, were set by a higher level Wells Fargo Office. The Fruitvale branch was very aggressive selling products to

minority customers, including mortgage loans.  The witness explained that she was trained to sell the benefit of a product and not discuss the potential risks or downside of the product.

28.    CW 2 explained that the Bank originated a higher rate of adjustable rate loans to minority borrowers than white borrowers, and very few minority borrowers received conventional 30-year fixed rate mortgages, which were approved mostly for non-minority borrowers.   The witness very rarely saw conventional loans being issued to borrowers with a Hispanic name.  The witness stated that minority borrowers complained that they did not understand the terms of their loans and that loan officers failed to fully explain the adverse consequences of the adjustable rate loans.

29.    CW 3 stated that minority borrowers regularly complained that they were led to believe they had obtained a fixed rate loan only to subsequently discover that it was in reality an adjustable rate loan.  Minority borrowers who were often not as sophisticated as white borrowers were particularly susceptible to not understanding their loan terms.

30.    CW 3 stated that Wells Fargo loan officers failed to adequately explain to minority borrowers pertinent details regarding adjustable rate and interest-only loans, and that the Bank also failed to provide brochures at branch locations which fully explained these loans.  Rather, disclosures were sent in the mail after a customer applied for the loan, and Bank employees typically did not explain the details once the customer received a brochure.  Additionally, the Bank required that loan officers themselves pay if they wanted to provide product brochures written in Spanish. The witness explained that Wells Fargo merely trained its loan officers to ensure that borrowers received disclosures, but were not

required to discuss the disclosures with a borrower or ensure that the borrower understood them.

31.    CW 1 said that minority borrowers did not always appear to understand the Bank's products, including mortgage loans.

### ii.    Wells Fargo profiled Bank customers to sell products

32.    CW 1 said that the Bank's computer and data system profiled customers and targeted them with a variety of products, including mortgage loans. These products often appeared as "pop-ups" on the tellers screen and the tellers were required to offer these products. The number of "pop-up" offers the tellers clicked when talking with a customer was a factor the bank used to evaluate their performance.  The Bank provided tellers with incentive pay for referring customers who signed up for these offers, which included mortgage loans.

### iii.    Minorities in Oakland Receive More Expensive Loan Terms from Wells Fargo Regardless of Creditworthiness

33.    As discussed herein, a non-exhaustive list of the types of predatory loans that Wells Fargo steered minorities into when they otherwise qualified for less expensive and less risky loans include the following:  high-cost loans (*i.e.*, loans with an interest rate that was at least 3% above the Treasury rate prior to 2010 and 1.5% above the prime mortgage rate thereafter),[10] subprime loans, interest-only loans, balloon payment loans, loans with prepayment penalties, negative amortization loans, no documentation loans, higher cost government

---

[10] This definition applies to first lien loans.

loans, including FHA[11] and VA[12] loans and HELOC's, and/or ARM loans with teaser rates (i.e., lifetime maximum rate > initial rate + 6%).

34. Data reported by the Bank and available through both public and private databases shows that minorities in Oakland received more expensive loan terms from Wells Fargo more frequently than white borrowers regardless of creditworthiness.

35. A regression analysis of this data controlling for borrower race and objective risk characteristics such as credit history, loan-to-value ratio, and the ratio of loan amount to income demonstrates that, from 2004-2013, an African-American borrower in Oakland was 2.403 times more likely to receive a loan with predatory terms as a white borrower in Oakland possessing similar underwriting and borrower characteristics.[13] The regression analysis further demonstrates that a Hispanic borrower in Oakland was 2.520 times more likely to receive a predatory loan as a white borrower possessing similar underwriting and borrower characteristics. These odds ratios demonstrate a pattern of statistically significant differences between African-American and white borrowers and between Hispanic and white borrowers. [14]

---

[11] FHA loans are insured by the Federal Housing Administration and require borrowers to pay for mortgage insurance and may entail other costs. People with credit scores under 500 generally are ineligible for FHA loans.

[12] VA loans are guaranteed by the U.S. Department of Veterans Affairs, available to veterans or surviving spouses who do not remarry, and generally do not require a down payment on the property.

[13] As alleged throughout the complaint, all references to the date range 2004-2013 are intended to include the time period up to and including December 31, 2013. Wells Fargo issued more expensive loans to minority borrowers in Oakland during this time period.

[14] Statistical significance is a measure of probability that an observed outcome would not have occurred by chance. As used in this Complaint, an outcome is statistically significant if the probability that it could have occurred by chance is less than 1%.

36.     The regression analysis also shows that these disparities persist when comparing only borrowers with FICO scores above 660. An African-American borrower in Oakland with a FICO score above 660 was 2.261 times more likely to receive a predatory loan as a white borrower in Oakland with similar underwriting and borrower characteristics. A Hispanic borrower in Oakland with a FICO score above 660 was 2.366 times more likely to receive a predatory loan as a white borrower in Oakland with similar underwriting and borrower characteristics. These odds ratios demonstrate a pattern of statistically significant differences between African-American and white borrowers and between Hispanic and white borrowers.

37.     A similar regression analysis taking into account the racial makeup of the borrower's neighborhood rather than the individual borrower's race shows that borrowers in heavily minority neighborhoods in Oakland were more likely to receive more expensive and higher risk loans than borrowers in heavily white neighborhoods. For example, a borrower in a minority census tract (census tract consisting of at least 50% African-American or Hispanic households) was 3.207 times more likely to receive a predatory loan as a borrower with similar characteristics in a non-minority neighborhood in Oakland (census tract with at least 50% white households). These odds ratios demonstrate a pattern of statistically significant differences between African-American and white borrowers and between Hispanic and white borrowers.

38.     Additionally, data reported by the Bank and available through public databases shows that in 2004-2013, 6.8% of loans made by Wells Fargo to African-American and Hispanic customers in Oakland were high cost, but only 1.6% of loans made to white customers in Oakland were high cost. This data demonstrates

a pattern of statistically significant differences in the product placement for high cost loans between minority and white borrowers.

39.     Thus, the disparities regarding the issuance of more expensive and higher risk loans to minority borrowers are not the result of or otherwise explained by legitimate non-racial underwriting criteria.

### iv.     Oakland' Data Analysis is Corroborated by Additional Studies/Reports

40.     According to *Discretionary Pricing, Mortgage Discrimination, and the Fair Housing Act*, 45 HARVARD CIVIL RIGHTS-CIVIL LIBERTIES LAW REV. 375, 398 (2010), several studies dating back to 2000 have established that minority borrowers were charged higher interest rates/fees than similar creditworthy white borrowers.

41.     Likewise, according to *A Racial Financial Crisis*, 83 TEMPLE LAW REV. 941, 947, 949 (2011), one study concluded that "even after controlling for underwriting variables, African-American borrowers were 6.1% to 34.3% more likely than whites to receive a higher rate subprime mortgage during the subprime boom." And another study found that significant loan pricing disparity exists among low risk borrowers – African-American borrowers were 65% more likely to receive a subprime home purchase loan than similar creditworthy white borrowers, and 124% more likely to receive a subprime refinance loan.

42.     Similarly, the Center for Responsible Lending's November 2011 Report, *Lost Ground, 2011: Disparities in Mortgage Lending and Foreclosures*, stated that "racial and ethnic differences in foreclosure rates persist even after accounting for differences in borrower incomes." Further, the Center stated it is "particularly troublesome" that minorities received riskier loans "even within [similar] credit ranges." For example, among borrowers having FICO scores above

660, the incidence of higher rate loans among various groups was as follows: whites – 6.2%; African-American – 21.4%; and Hispanic – 19.3%.

43.    A seminal report on foreclosure activity by Mark Duda and William Apgar documents the negative impact that rising foreclosures have on low-income and low-wealth minority communities, using Chicago as a case study.  Mr. Apgar is a Senior Scholar at the Joint Center for Housing Studies of Harvard University, and a Lecturer on Public Policy at Harvard's John F. Kennedy School of Government. He previously served as the Assistant Secretary for Housing/Federal Housing Commissioner at the U.S. Department of Housing and Urban Development, and also Chaired the Federal Housing Finance Board. Mr. Apgar holds a Ph.D. in Economics from Harvard University. Mr. Duda is a Research Fellow at the Joint Center for Housing Studies. The Apgar-Duda report has continually been cited by subsequent governmental, public sector, and private sector reports due to its clarity and thoroughness with respect to the negative impact foreclosures have on lower-income and minority neighborhoods.[15]

44.    This significant report highlights the foreseeability of foreclosures arising from issuing more expensive and higher risk loans demonstrating that such foreclosures impose significant and predictable costs on borrowers, municipal governments, and neighboring homeowners.

45.    Another report, by the Center for Responsible Lending, uses a national dataset to show that the foreclosure rate for low- and moderate-income African-Americans is approximately 1.8 times higher than it is for low- and moderate-income non-Hispanic whites. The gap is smaller for Hispanics, especially among low-income households, but even among low-income Hispanics

---

[15] *See* W. Apgar, M. Duda & R. Gorey, *The Municipal Costs of Foreclosures: A Chicago Case Study* (2005) (*available at* http://www.nw.org/network/neighborworksProgs/ foreclosuresolutions/documents/2005Apgar-DudaStudy- FullVersion.pdf).

the foreclosure rate is 1.2 times that of low-income whites. Racial and ethnic disparities in foreclosure rates cannot be explained by income, since disparities persist even among higher-income groups. For example: approximately 10 percent of higher-income African-American borrowers and 15 percent of higher-income Hispanic borrowers have lost their home to foreclosure, compared with 4.6 percent of higher income non-Hispanic white borrowers. Overall, low- and moderate-income African-Americans and middle- and higher-income Hispanics have experienced the highest foreclosure rates.[16]

**C.** **Wells Fargo's Targeting of Minorities who in Fact Receive More Expensive Loan Terms Regardless of Creditworthiness Causes Foreclosures**

**i.** **Data shows that Wells Fargo's foreclosures are disproportionately located in minority neighborhoods in Oakland**

46. In addition to the disproportionate distribution of Wells Fargo foreclosures in African-American and Hispanic neighborhoods, disparate rates of foreclosure based on race further demonstrate Wells Fargo's failure to follow responsible underwriting practices in minority neighborhoods. While 14.1% of Wells Fargo's loans in neighborhoods consisting of greater than 50% African-American or Hispanic neighborhoods in Oakland result in foreclosure, the same is true for only 3.3% of its loans in non-minority (at least 50% white) neighborhoods in Oakland. In other words, a Wells Fargo loan in an African-American or Hispanic neighborhood is 4.752 times more likely to result in foreclosure as a Wells Fargo loan in a non-minority neighborhood. These odds ratios demonstrate

---

[16] Center for Responsible Lending, *Lost Ground, 2011: Disparities in Mortgage Lending and Foreclosures* (2011) (*available at* www.responsiblelending.org/mortgage-lending/research--analysis/*Lost-Ground-2011*.pdf).

a pattern of statistically significant differences between African-American and white borrowers and between Hispanic and white borrowers.

47. Thus, Wells Fargo's discretionary lending policies and pattern or practice of targeting of minorities, who in fact receive more expensive and unfavorable loan terms regardless of creditworthiness, have caused and continue to cause foreclosures in Oakland.

### ii. Data shows that Wells Fargo's loans to minorities result in especially quick foreclosures in Oakland

48. A comparison of the time from origination to foreclosure of Wells Fargo's loans originated in Oakland from 2004 to 2013 shows a disparity with respect to the speed with which loans to Hispanics and white borrowers move into foreclosure. The average time to foreclosure for Hispanic borrowers in Oakland is 3.411 years, and for white borrowers in Oakland is 3.861 years. These statistically significant disparities demonstrate that Wells Fargo aggressively moved Hispanic borrowers into foreclosure as compared with how the Bank handled foreclosures for white borrowers.

49. This disparity in time to foreclosure represents yet another statistical marker demonstrating that Wells Fargo engaged in lending practices consistent with reverse redlining. The disparity in time to foreclosure demonstrates that Wells Fargo is engaged in irresponsible underwriting in minority communities that does not serve the best interests of borrowers. If Wells Fargo were applying the same underwriting practices in Hispanic and white neighborhoods in Oakland, there would not be a significant difference in time to foreclosure. Were Wells Fargo underwriting borrowers in both communities with equal care and attention to proper underwriting practices, borrowers in Hispanic communities would not find themselves in financial straits significantly sooner than borrowers in white

communities. The faster time to foreclosure in Hispanic neighborhoods is consistent with underwriting practices in minority communities that are less concerned with determining a borrower's ability to pay and qualifications for the loan than they are in maximizing short-term profit.

50.     The HUD/Treasury Report confirms that time to foreclosure is an important indicator of predatory practices: "[t]he speed with which the subprime loans in these communities have gone to foreclosure suggests that some lenders may be making mortgage loans to borrowers who did not have the ability to repay those loans at the time of origination."[17]

### iii.     Data shows that the discriminatory loan terms cause the foreclosures in Oakland

51.     Steering borrowers into loans with predatory terms that are less advantageous than more favorable loans for which they qualify can cause foreclosures because the borrowers are required to make higher loan payments. The difference between what a borrower who is steered into a more expensive loan must pay and the lower amount for which the borrower qualified can cause the borrower to be unable to make payments on the mortgage. In such instances, the borrower would have continued to make payments on the mortgage and remained in possession of the premises had Wells Fargo made the loan without improperly steering the borrower into a more expensive loan. Steering borrowers in this manner, therefore, causes foreclosures and vacancies.

52.     Giving a loan to an applicant who does not qualify for the loan, especially a refinance or home equity loan, can also cause foreclosures and

---

[17] United States Department of Housing & Urban Development and United States Department of the Treasury, Curbing Predatory Home Mortgage Lending (2000), at 25 (*available at* http://www.huduser.org/Publications/pdf/treasrpt.pdf) ("HUD/Treasury Report").

vacancies. Some homeowners live in properties that they own subject to no mortgage. Other homeowners live in properties with modest mortgages that they can comfortably afford to pay. Where a lender, such as Wells Fargo, solicits such a homeowner to take out a home equity loan on their property, or alternatively, to refinance their existing loan into a larger loan without properly underwriting them to assure that they can make the monthly payments for the new, larger loan, the result is likely to be that the borrower will be unable to make payments on the mortgage. This is particularly true where the borrower is refinanced from a fixed-rate loan into an adjustable-rate loan that the lender knows the borrower cannot afford should interest rates rise. In some instances the lender may refinance the borrower into a new loan that the lender knows the borrower cannot sustain given the borrower's present debt obligations and financial resources. In such circumstances, the likely result of such practices is to cause homeowners who are otherwise occupying properties without a mortgage, or comfortably making payments on a modest existing mortgage, to be unable to make payment on a new, unaffordable loan. This, in turn, causes foreclosures and vacancies. If these unaffordable refinance and home equity loans had not been made, the subject properties would not have become vacant.

53.     A regression analysis of loans issued by Wells Fargo in Oakland from 2004-2013 controlling for objective risk characteristics such as credit history, loan to value ratio, and the ratio of loan amount to income demonstrates that a predatory loan is 1.753 times more likely to result in foreclosure than a non-predatory loan.

54.     A regression analysis of loans issued by Wells Fargo in Oakland from 2004-2013 controlling for objective risk characteristics such as credit history, loan to value ratio, and the ratio of loan amount to income demonstrates that a predatory loan issued to an African-American borrower is 2.583 times more likely to result

in foreclosure than a more favorable and less expensive loan issued to a white borrower in Oakland. The regression further establishes that a predatory loan issued to a Hispanic borrower is 3.312 times more likely to result in foreclosure than a more favorable and less expensive loan issued to a white borrower in Oakland.

## VI. OAKLAND HAS BEEN INJURED BY WELLS FARGO'S DISCRIMINATORY LOAN PRACTICES

55.    Oakland has suffered both non-economic and economic injuries as a direct result of Wells Fargo's pattern or practice of issuing predatory mortgage loans in minority neighborhoods in Oakland, and the City seeks redress for these injuries. The City does not seek redress in this action for injuries resulting from mortgages originated by lenders other than Wells Fargo.

56.    Wells Fargo continues to engage in the pattern or practice described herein with similar and continuing deleterious consequences to the City.

57.    Through the use of expert evidence and analytic tools such as Hedonic regression, Oakland is capable of establishing that the Bank's lending practices were the cause of the resulting injuries alleged herein in a manner that excludes other potential causes.

### A.    Non-Economic Injuries

58.    Wells Fargo's lending practices have adversely impacted the City's numerous programs designed to promote fair housing and a safe, integrated community where all residents have the opportunity to prosper. For example the Housing and Community Development Department is charged with managing the City's Public Housing and HUD programs which benefit minority homeowners in

particular.[18]  The Department provides various forms of assistance to enable low and moderate income residents to purchase homes.  One of the Department's primary objectives is to "identify and thwart predatory lending practices and collaborate with reputable lenders."  The Department also operates numerous Housing Repair and Rehabilitation Programs designed to assist low and moderate income homeowners correct health and safety violations, building code violations, abate code deficiencies, and major systems in danger of failure.[19] The City provides funding to certain non-profit organizations to promote fair housing and eliminate housing discrimination on the basis of race or national origin.[20] Additionally, the purpose and mission of the City's Nuisance Abatement Program is to "promote the health and safety of Oakland citizens by preventing, identifying, and eliminating public nuisances."  These nuisances involve numerous activities directly linked to the Bank's lending practices, including, but not limited to  abandoned or deteriorated property, structural and electrical hazards, criminal activity, fire hazards, zoning violations, excess debris and trash, and litter.[21]

### B.    Economic Injuries

59.    The City has suffered economic injury based upon reduced property tax revenues resulting from (a) the decreased value of the vacant properties themselves, and (b) the decreased value of properties surrounding the vacant properties. In addition, the City has suffered economic injury resulting from the cost of municipal services that it provided and still must provide to remedy blight

---

[18] http://www2.oaklandnet.com/Government/o/hcd/a/BusinessGoals/index.htm

[19] http://www2.oaklandnet.com/Government/o/hcd/s/HousingRepairRehabPrograms/DOWD008717

[20] http://www2.oaklandnet.com/Government/o/hcd/s/HSC/DOWD008652

[21] http://www2.oaklandnet.com/Government/o/CityAdministration/index.htm

and unsafe and dangerous conditions which exist at properties that were foreclosed as a result of Wells Fargo's illegal lending practices.

### C. Oakland has been Injured by a Reduction in Property Tax Revenues from Foreclosures Caused by Discriminatory Loans Issued by Wells Fargo

60.     When a home falls into foreclosure, it affects the property value of the foreclosed home as well as the values of other homes in the neighborhood. These decreased property values in turn reduce property tax revenues to the City.  As property values drop, Oakland communities could lose many millions in property tax revenues from the decreased value of the foreclosed homes themselves and those in the surrounding neighborhoods.

61.     Vacancies and short sales even prior to completion of foreclosure also result in diminished home values. Indeed, "[i]n 12 states, including California, Florida, Arizona, New York and New Jersey, pre-foreclosure sales actually outnumbered REO sales."[22] Such distressed sales reduce property values.[23]

62.     Homes in foreclosure tend to experience a substantial decline in value, and the relative decline can be measured by a number of objective criteria, including the well-established Case-Shiller Home Price Index.   A portion of this lost home value is attributable to homes foreclosed as a result of Wells Fargo's discriminatory loan practices.

63.     The decreased property values of foreclosed homes in turn reduce property tax revenues to the City and constitute damages suffered by Oakland.

---

[22]   *See*   http://www.realtytrac.com/content/news-and-opinion/short-sales-increasing-in-2012--short -sale-process----realtytrac-7204.

[23]   *See*   http://www.realtytrac.com/content/foreclosure-market-report/us-foreclosure-sales-and-short-sales-report-q1-2013-7732.

Property tax losses suffered by Oakland as a result of Wells Fargo's foreclosures are fully capable of empirical quantification.

64.      Routinely maintained property tax and other data allow for the precise calculation of the property tax revenues lost by the City as a direct result of particular Wells Fargo foreclosures. Using a well-established statistical regression technique that focuses on effects on neighboring properties, the City can isolate the lost property value attributable to Wells Fargo foreclosures from losses attributable to other causes, such as neighborhood conditions. This technique, known as Hedonic regression, when applied to housing markets, isolates the factors that contribute to the value of a property by studying thousands of housing transactions. Those factors include the size of a home, the number of bedrooms and bathrooms, whether the neighborhood is safe, whether neighboring properties are well-maintained, and more. Hedonic analysis determines the contribution of each of these house and neighborhood characteristics to the value of a home.

65.      The number of foreclosures in a neighborhood is one of the neighborhood traits that Hedonic regression can examine. Hedonic regression allows for the calculation of the impact on a property's value of the first foreclosure in close proximity (*e.g.*, ⅛ or ¼ of a mile), the average impact of subsequent foreclosures, and the impact of the last foreclosure.

66.      Foreclosures attributable to Wells Fargo in minority neighborhoods in Oakland can be analyzed through Hedonic regression to calculate the resulting loss in the property values of nearby homes. This loss can be distinguished from any loss attributable to non-Wells Fargo foreclosures or other causes. The loss in property value in minority neighborhoods in Oakland attributable to Wells Fargo's unlawful acts and consequent foreclosures can be used to calculate the City's corresponding loss in property tax revenues.

67.     Various studies establish that Hedonic regression can be used for this purpose. A study published by the Fannie Mae Foundation, using Chicago as an example, determined that each foreclosure is responsible for an average decline of approximately 1.1% in the value of each single-family home within an eighth of a mile.[24]  Application of such Hedonic regression methodology to data regularly maintained by Oakland can be used to quantify precisely the property tax injury to the City caused by Wells Fargo's discriminatory lending practices and resulting foreclosures in minority neighborhoods.

68.     Other studies have focused on the impact of abandoned homes on surrounding property values. A study in Philadelphia, for example, found that each home within 150 feet of an abandoned home declined in value by an average of $7,627; homes within 150 to 299 feet declined in value by $6,810; and homes within 300 to 449 feet declined in value by $3,542.[25]

69.     A Los Angeles study reported, "[i]t is conservatively estimated that each foreclosed property will cause the value of neighboring homes within an eighth of a mile to drop 0.9%." Thus, "[i]n Oakland, impacted homeowners could experience property devaluation of $53 billion."[26] This decreased property value of neighboring homes in turn reduces property tax revenues to the City.

70.     The studies cited herein highlight the foreseeability of tax related harm to the City as the result of foreclosures arising from issuing more expensive and higher risk loans to minority borrowers who qualified for more favorable loans.

---

[24] *See* Dan Immergluck & Geoff Smith, *The External Costs of Foreclosure: The Impact of Single-Family Mortgage Foreclosures on Property Values*, 17 Housing Policy Debate 57, 69 (2006).

[25] *See* Anne B. Shlay & Gordon Whitman, *Research for Democracy: Linking Community Organizing and Research to Leverage Blight Policy*, at 21 (2004).

[26] The Alliance of Californians for Community Empowerment and the California Reinvestment Coalition, *The Wall Street Wrecking Ball: What Foreclosures are Costing Los Angeles Neighborhoods*, at 3 (2011) ("Cost to Los Angeles Report").

**D. Oakland Is Injured Because It Provided and Still Must Provide Costly Municipal Services for Foreclosure Properties in Minority Neighborhoods as a Direct Result of Discriminatory Loans Originated or Purchased by Wells Fargo**

71. Wells Fargo foreclosure properties cause direct costs to the City because the City is required to provide increased municipal services at these properties. Even prior to completion of the foreclosure process, data shows that 20% of homes are vacated.[27] These services would not have been necessary if the properties had not been foreclosed upon. Moreover, these foreclosures resulting from Wells Fargo's unlawful conduct have contributed to the necessity for the City to divert essential municipal services that would have been utilized for other purposes to promote the health, welfare, and safety of its residents.

72. For example, the City's Police and Fire Departments have sent, and will continue to send personnel and police/fire vehicles to Wells Fargo foreclosure properties to respond to a variety of problems, including increased vagrancy, criminal activity, fire hazards, and threats to public health and safety that arise at these properties because of their foreclosure status. Because violent crime has generally been found to increase due to foreclosures, the Oakland Police and Fire Departments must respond to calls reporting suspicious activity at foreclosure properties and perform ongoing investigations involving criminal activity, including gang activity, at these properties.

73. The Oakland Building Services Division has devoted, and will continue to devote personnel time and out-of-pocket funds to perform a number of tasks that arise at these properties because of their foreclosure status. These include, but are not limited to the following: (a) inspect and issue violations in contravention of California and local law; (b) undertake reasonable precautions to

---

[27] *See* http://www.realtytrac.com/content/foreclosure-market-report/owner-vacated-foreclosure-update-7771.

protect the public at dangerous property sites, including but not limited to erecting appropriate physical barriers and boarding-up dangerous conditions at the properties; (c) condemn and demolish vacant structures deemed an imminent hazard to public safety.

74.     The City frequently hires independent contractors to perform certain services, including, but not limited to, (i) removing excess vegetation at vacant properties, (ii) hauling away trash and debris at vacant properties, (iii) boarding vacant property from casual entry, (iv) putting up fencing to secure vacant properties, and (v) painting and removing graffiti at vacant properties.

75.     The Oakland City Attorney's Office has devoted, and will continue to devote personnel time and out-of-pocket resources perform a number of tasks that arise at these properties because of their foreclosure status. These include, but are not limited to the following: (a) prosecuting code enforcement cases; and (b) pursuing court ordered injunctions involving a myriad of potential problems at foreclosure properties.

76.     As stated by the *Cost to Los Angeles* Report, "[l]ocal government agencies have to spend money and staff time on blighted foreclosed properties, providing maintenance, inspections, trash removal, increased public safety calls, and other code enforcement services .... Responding to these needs is a gargantuan task that involves multiple agencies and multiple levels of local government."[28]

77.     Moreover, the Apgar-Duda report underscores the foreseeability of municipal costs as the result of foreclosures arising from issuing more expensive and higher risk loans to minority borrowers who qualified for more favorable loans.

---

[28] *The Wall Street Wrecking Ball: What Foreclosures are Costing Los Angeles Neighborhoods, supra,* n. 23.

## VII.   SAMPLE PROPERTIES IN THE CITY OF OAKLAND

### A.    Foreclosures

78.    Plaintiff has preliminarily identified 982 more expensive and higher risk loans issued to minority borrowers by Wells Fargo in Oakland between 2004-2013 that resulted in commencement of foreclosure proceedings.[29] The City has already incurred, or will incur in the future, damages corresponding to each of these properties.  A sample of property addresses corresponding to these foreclosures is set forth below:

836 31st Street, Oakland, CA 94608

2208 50th Avenue, Oakland, CA 94601

7827 Weld Street, Oakland, CA 94621

2681 79th Avenue, Oakland, CA 94605

### B.    Predatory Loans Issued Subsequent to September 21, 2013

79.    Wells Fargo has continued to issue predatory mortgage loans to minorities in Oakland subsequent to September 21, 2013. A sample of property addresses corresponding to the issuance of these loans is set forth below:

2226 42nd Avenue, Oakland 94601 (9/25/13)

10226 Graffian Street, Oakland 94603 (10/16/13)

9400 Granada Avenue, Oakland 94605 (12/12/13)

9772 Anza Avenue, Oakland 94605 (12/24/13)

---

[29] Plaintiff anticipates that it will be able to identify more foreclosures resulting from the issuance of more expensive and higher risk loans to minority borrowers who qualified for more favorable loans during this time period with the benefit of discovery. This conclusion derives from the fact that because of certain reporting limitations, the publicly available mortgage loan databases utilized by Plaintiff are not as comprehensive as the mortgage loan databases maintained by and in the possession of an issuing bank.

## VIII.  CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### (Violation of the Federal Fair Housing Act, 42 U.S.C. §§ 3601, *et seq.*)

80.    The City repeats and incorporates by reference all allegations contained in the preceding paragraphs as if fully set forth herein.

81.    The FHA's stated purpose is to provide, "within constitutional limitations, for fair housing throughout the United States."

82**.**    In contravention of that purpose, Wells Fargo's acts, policies, and practices as described constitute intentional lending discrimination on the basis of race. Wells Fargo has intentionally targeted residents of predominantly African-American and Hispanic neighborhoods in Oakland for different treatment than residents of predominantly white neighborhoods in Oakland with respect to mortgage lending. Wells Fargo has intentionally targeted residents of these neighborhoods for high-cost loans without regard to their credit qualifications and without regard to whether they qualify for more advantageous loans, including prime loans. Wells Fargo has intentionally targeted residents of these neighborhoods for increased interest rates, points, and fees, and for other disadvantageous loan terms including, but not limited to, adjustable rates, prepayment penalties, and balloon payments. Wells Fargo has intentionally targeted residents of these neighborhoods for unfair and deceptive lending practices in connection with marketing and underwriting mortgage loans.

83.    Wells Fargo's acts, policies, and practices have had an adverse and disproportionate impact on African-Americans and Hispanics and residents of predominantly African-American and Hispanic neighborhoods in Oakland as compared to similarly situated whites and residents of predominantly white neighborhoods in Oakland. This adverse and disproportionate impact is the direct

result of Wells Fargo's policies of providing discretion to loan officers and others responsible for mortgage lending; failing to monitor this discretion to ensure that borrowers were being placed in loan products on a nondiscriminatory basis when Wells Fargo had notice of widespread product placement disparities based on race and national origin; giving loan officers and others responsible for mortgage lending large financial incentives to issue loans to African-Americans and Hispanics that are costlier than better loans for which they qualify; otherwise encouraging and directing loan officers and others responsible for mortgage lending to steer borrowers into high-cost loans or loans with adjustable rates, prepayment penalties, or balloon payments without regard for whether they qualify for better loans, including but not limited to prime loans; and setting interest rate caps. These policies have caused African-Americans and Hispanics and residents of predominantly African-American and Hispanic neighborhoods in Oakland to receive mortgage loans from Wells Fargo that have materially less favorable terms than mortgage loans given by Wells Fargo to similarly situated whites and residents of predominantly white neighborhoods in Oakland, and that are materially more likely to result in foreclosure.

84.    Wells Fargo's residential lending-related acts, policies, and practices constitute reverse redlining and violate the Fair Housing Act as:

(a)    Discrimination on the basis of race and national origin in making available, or in the terms and conditions of, residential real estate-related transactions, in violation of 42 U.S.C. § 3605(a); and

(b)    Discrimination on the basis of race and national origin in the terms, conditions, or privileges of sale of a dwelling, in violation of 42 U.S.C. § 3604(b).

85.     Wells Fargo's policies or practices are not justified by business necessity or legitimate business interests.

86.     Wells Fargo's policies and practices are continuing.

87.     The City is an "aggrieved person" as defined by 42 U.S.C. § 3602(i) and has suffered damages as a result of Wells Fargo's conduct.

88.     The City's damages include lost tax revenues and the need to provide increased municipal services. The loss of tax revenues at specific foreclosure sites and at closely neighboring properties in predominantly minority neighborhoods of the City was a foreseeable consequence that was fairly traceable to Wells Fargo's discriminatory lending. Likewise, the need to provide increased municipal services at blighted foreclosure sites in predominantly minority neighborhoods of the City was a foreseeable consequence that was fairly traceable to Wells Fargo's discriminatory lending.

89.     Wells Fargo's policies and practices, as described herein, had the purpose and effect of discriminating on the basis of race or national origin. These policies and practices were intentional, willful, or implemented with reckless disregard for the rights of African-American and Hispanic borrowers.

90.     The City has substantial interest in preventing discriminatory lending that causes disproportionately minority home foreclosures within its boundaries, in preventing segregated areas where minority loans are more likely to foreclose, and in holding banks accountable for damages arising from that discriminatory lending. Accordingly, the City's interests in obtaining injunctive relief to prevent such discrimination and in remedying the blight and recovering the lost property taxes resulting from the disproportionately minority home foreclosures in Oakland are directly related to ensuring "fair housing throughout the United States."

91.     In doing the acts herein alleged, Wells Fargo acted with oppression, fraud, malice, and in reckless or willful disregard of the City's rights, and Oakland therefore are entitled to punitive damages in an amount according to proof at the time of trial.

## SECONDCLAIM FOR RELIEF
### (Violation of the California Fair Employment and Housing Act Gov't Code §§ 12900, *et seq.*)

92.     The City repeats and incorporates by reference all allegations contained in the preceding paragraphs as if fully set forth herein.

93.     FEHA seeks to prohibit discrimination on the basis of race and national origin regarding the purchase of housing within California.

94.     In contravention of that purpose, Wells Fargo's acts, policies, and practices as described constitute lending discrimination on the basis of race. Wells Fargo has targeted residents of predominantly African-American and Hispanic neighborhoods in Oakland for different treatment than residents of predominantly white neighborhoods in Oakland with respect to mortgage lending. Wells Fargo has targeted residents of these neighborhoods for high-cost loans without regard to their credit qualifications and without regard to whether they qualify for more advantageous loans, including prime loans. Wells Fargo has targeted residents of these neighborhoods for increased interest rates, points, and fees, and for other disadvantageous loan terms including, but not limited to, adjustable rates, prepayment penalties, and balloon payments. Wells Fargo has targeted residents of these neighborhoods for unfair and deceptive lending practices in connection with marketing and underwriting mortgage loans.

95.     Wells Fargo's acts, policies, and practices have had an adverse and disproportionate impact on African-Americans and Hispanics and residents of

predominantly African-American and Hispanic neighborhoods in Oakland as compared to similarly situated whites and residents of predominantly white neighborhoods in Oakland. This adverse and disproportionate impact is the direct result of Wells Fargo's policies of providing discretion to loan officers and others responsible for mortgage lending; failing to monitor this discretion to ensure that minority borrowers were placed in less expensive  loan products for which they were qualified when Wells Fargo had notice of widespread product placement disparities based on race and national origin; giving loan officers and others responsible for mortgage lending large financial incentives to issue loans to African-Americans and Hispanics that are costlier than better loans for which they qualify; otherwise encouraging and directing loan officers and others responsible for mortgage lending to steer borrowers into more expensive and higher risk loans without regard for whether they qualify for less expensive loans; failing to properly underwrite loans to minority borrowers despite having extensive analytical tools and data to perform this task. This non-exhaustive list of policies have caused African-Americans and Hispanics and residents of predominantly African-American and Hispanic neighborhoods in Oakland to receive mortgage loans from Wells Fargo that are more expensive and have higher risk features than mortgage loans given by Wells Fargo to similarly situated whites and residents of predominantly white neighborhoods in Oakland and are more likely to result in damages to the City.

96.    Wells Fargo's residential lending-related acts, policies, and practices constitute reverse redlining and redlining and violate FEHA:

(a)    Discrimination on the basis of race and national origin in providing financial assistance for the purchase of housing, in violation of California Government Code § 12955(e); and

(b)   Discrimination on the basis of race and national origin in making available, or in the terms and conditions of, residential real estate-related transactions, in violation of California Government Code § 12955(i).

97.   Wells Fargo's policies or practices are not justified by business necessity or legitimate business interests.

98.   Wells Fargo's policies and practices are continuing.

99.   The City is an "aggrieved person" as defined by Gov't Code § 12989.1 and has suffered damages as a result of Well Fargo's conduct.

100.   The City's damages include lost tax revenues and the need to provide increased municipal services. The loss of tax revenues at specific foreclosure sites and at closely neighboring properties in predominantly minority neighborhoods of the City was a foreseeable consequence that was fairly traceable to Wells Fargo's discriminatory lending. Likewise, the need to provide increased municipal services at blighted foreclosure sites in predominantly minority neighborhoods of the City was a foreseeable consequence that was fairly traceable to Wells Fargo's discriminatory lending.

101.   Wells Fargo's policies and practices, as described herein, had the purpose and effect of discriminating on the basis of race or national origin. These policies and practices were intentional, willful, or implemented with reckless disregard for the rights of African-American and Hispanic borrowers.

102.   The City has substantial interest in preventing discriminatory lending that causes disproportionately minority home foreclosures within its boundaries, in preventing segregated areas where minority loans are more likely to foreclose, and in holding banks accountable for damages arising from that discriminatory lending. Accordingly, the City's interests in obtaining injunctive relief to prevent such discrimination and in remedying the blight and recovering the lost property

taxes resulting from the disproportionately minority home foreclosures in Oakland are directly related to ensuring "fair housing throughout the United States."

103.   In doing the acts herein alleged, Wells Fargo acted with oppression, fraud, malice, and in reckless or willful disregard of the City's rights, and Oakland therefore are entitled to punitive damages in an amount according to proof at the time of trial.

**THIRD CLAIM FOR RELIEF**
**(Common Law Claim For Unjust Enrichment)**

104.   The City repeats and incorporates by reference all preceding paragraphs as if fully set forth herein.

105.   Wells Fargo has received and utilized benefits derived from a variety of municipal services, including police protection, as well as zoning ordinances, tax laws, and other laws and services that have enabled Defendants to operate and profit within the City of Oakland while engaging in a lengthy pattern and practice of unlawful activity.  Wells Fargo is not legally entitled to the benefits of these services to the extent they were utilized to further the unlawful conduct alleged herein.

106.   Defendants are aware of and have taken advantage of the services and laws provided by the City of Oakland to further their unlawful businesses practices.

107.   As a direct and proximate result of Defendants' predatory lending practices, Defendants have been enriched at the City's expense by utilizing benefits conferred by the City and, rather than engaging in lawful lending practices, practicing unlawful lending practices that have both denied the City revenues it had properly expected through property and other tax payments and by costing the City additional monies for services it would not have had to provide in the neighborhoods affected by foreclosures due to predatory lending, absent the

Defendants' unlawful activities. Additionally, by foreclosing on the properties for which Wells Fargo issued predatory loans, the City expended otherwise unnecessary externalities to protect the properties acquired by Defendants in foreclosure, including, at a minimum, increased police protection. Defendants were specially benefitted as the new owners of these properties. Defendants have failed to remit those wrongfully obtained benefits or reimburse the City for its costs improperly caused by Defendants, and retention of the benefits by Defendants would be unjust without payment.

108.   In addition, to its detriment the City has paid for the Defendants' externalities or Defendants' costs of harm caused by its mortgage lending discrimination, in circumstances where Defendants are and have been aware of this obvious benefit and retention of such benefit would be unjust.

## DEMAND FOR JURY TRIAL

109.   Plaintiff hereby demands a trial by jury in this action on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, the City respectfully prays that the Court grant it the following relief:

A.   Enter a declaratory judgment that the foregoing acts, policies, and practices of Wells Fargo violate the FHA 42 U.S.C. §§ 3604 and 3605 and California Government Code § 12900, *et seq*.;

B.   Enter a permanent injunction enjoining Wells Fargo and its directors, officers, agents, and employees from continuing the discriminatory conduct described herein, and directing Wells Fargo and its directors, officers, agents, and employees to take all affirmative steps necessary to remedy the effects of the

discriminatory conduct described herein, and to prevent additional instances of such conduct or similar conduct from occurring in the future, pursuant to 42 U.S.C. § 3613(c)(1) and California Government Code § 12989.2;

C. Award compensatory damages to the City in an amount to be determined by the jury that would fully compensate the City of Oakland for its injuries caused by the conduct of Wells Fargo alleged herein, pursuant to 42 U.S.C. § 3613(c)(1) and California Government Code § 12989.2;

D. Award punitive damages to the City in an amount to be determined by the jury that would punish Wells Fargo for the willful, wanton, and reckless conduct alleged herein, and that would effectively deter similar conduct in the future, pursuant to 42 U.S.C. § 3613(c)(1) and California Government Code § 12989.2;

E. Award the City its reasonable attorneys' fees and costs, pursuant to 42 U.S.C. § 3613(c)(2) and California Government Code § 12989.2;

F. Require payment of pre-judgment interest on monetary damages; and

G. Order such other relief as this Court deems just and equitable.


Date: September 21, 2015           OAKLAND CITY ATTORNEY


                                   By: (-) *Barbara J. Parker*
                                       Barbara J. Parker


Dated: September 21, 2015          PERETZ & ASSOCIATES


                                   By: (-) *Yosef Peretz*
                                       Yosef Peretz

//
//
//

1

Dated: September 21, 2015          TRIAL & APPELLATE RESOURCES, P.C.

2

By: (-) *Joel Liberson*

3

Joel Liberson

4

Dated: September 21, 2015          CENTER FOR CONSTITUTIONAL

5

LITIGATION

6

By: (-) *Robert S. Peck*

7

Robert S. Peck

8

(*pro hac vice* pending*)*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28