1

2

3

4                      UNITED STATES DISTRICT COURT

5                    NORTHERN DISTRICT OF CALIFORNIA

6

7   THE CITY OF OAKLAND,                    Case No. 15-cv-04321-EMC

8              Plaintiff,

9        v.                                 ORDER GRANTING IN PART AND
                                            DENYING IN PART DEFENDANTS'
10  WELLS FARGO BANK, N.A., et al.,         MOTION TO DISMISS

11             Defendants.                  Docket No. 107

12

13              I.        **INTRODUCTION**

14        The City of Oakland ("Oakland") brings this suit against Wells Fargo & Co. and Wells

15  Fargo Bank, N.A. (herein collectively "WF"), alleging violations of the Fair Housing Act of 1968

16  ("FHA"), 42 U.S.C. §§ 3601, *et seq.*, and the California Fair Employment and Housing Act

17  ("FEHA"), Cal. Gov. Code §§ 12900, *et seq.*  Specifically, it alleges that WF offered mortgage

18  loans to Oakland residents on a race-discriminatory basis, constituting both intentional and

19  disparate-impact discrimination.  This discrimination allegedly caused high rates of foreclosures

20  which heavily impacted minority borrowers and harmed Oakland in various ways.  In light of new

21  guidance from the Supreme Court, *see Bank of America Corp. v. City of Miami*, 137 S. Ct. 1296

22  (2017), WF brings this motion to dismiss primarily challenging Oakland's ability to demonstrate

23  proximate cause.

24        Oakland claims it suffered three kinds of injuries resulting from WF's unlawful loan

25  practices: (1) decreases in property-tax revenues, (2) increases in municipal expenditures, and (3)

26  neutralized spending in Oakland's fair-housing programs.  The motion is **DENIED** as to claims

27  based on the first injury.  The motion is also **DENIED** as to claims based on the second injury

28  insofar as those claims seek injunctive and declaratory relief, but they are **DISMISSED**

United States District Court
Northern District of California

**WITHOUT PREJUDICE** to the extent they seek damages.  Oakland's claims based on the third injury are **DISMISSED WITHOUT PREJUDICE**.

## II.   FACTUAL BACKGROUND

The First Amended Complaint alleges the following.

A.   Discrimination

WF discriminated against racial minorities in both the origination of mortgage loans and loan refinancing decisions.  Docket No. 104 ("FAC") ¶ 3.  In doing so, WF engaged in both intentional discrimination and disparate-impact discrimination.  *Id.* ¶ 4.

As to Oakland's intentional-discrimination claim, Oakland alleges that "Wells Fargo's employees intentionally steered minority borrowers into high cost loans because of their race." *Id.* ¶ 31.  Additionally, WF employees "used race as a factor in determining" what loans to offer borrowers.  *Id.* ¶ 32.  For example, WF steered minority borrowers into adjustable-rate loans instead of fixed-rate loans, failed to explain loan terms, and failed to provide product brochures in Spanish.  *Id.* ¶¶ 33-37.  Minority borrowers were "particularly susceptible" to not understanding loan terms.  *Id.* ¶ 34.  WF targeted minorities for disadvantageous loan terms regardless of their qualifications.  *Id.* ¶ 148.

As to the disparate-impact claim, Oakland alleges that WF engaged in various practices which, though facially neutral, "created an 'arbitrary, artificial, and unnecessary' barrier to fair housing opportunities" for minorities, *id.* ¶ 39, and "contributed to the adverse borrowing terms experienced by minority borrowers." *Id.* ¶ 41.  These practices primarily consisted of giving loan officers discretion and incentivizing them to offer loans that were costlier and entailed risks beyond which borrowers were qualified to handle.  *See id.* ¶¶ 39, 48, 53.  In trying to sell such loans, "[l]oan officers frequently use[d] race . . . as [a] prox[y] for their ability to sell more expensive loan products." *Id.* ¶ 47.  In part, this targeting was because "minority borrowers did not always appear to understand" the loans' terms.  *Id.* ¶ 36.  WF loan officers sold expensive loans to minority borrowers more frequently than they did to similarly situated white borrowers. *Id.* ¶¶ 44-48, 50, 62, 67.  Despite this disparity and due to "[s]ystematic problems with Wells Fargo's culture, employment practices, and internal controls," *id.* ¶ 58; *see id.* ¶¶ 53-61, WF

United States District Court
Northern District of California

allegedly failed to monitor and correct loan officers' actions. *Id.* ¶ 50.

B.    Foreclosures

As a result of WF's loan practices, minority borrowers from WF were more likely than similarly situated white borrowers to have a high-cost, high-risk ("HCHR") loan which Oakland calls "discriminatory loan[s]." *Id.* ¶ 68. These loans "have higher costs and risk features than more favorable and less expensive loans for which the borrower was eligible and which are regularly issued to similarly situated white borrowers." *Id.* ¶ 1. These HCHR loans include "loans that are rate-spread reportable under the Home Mortgage Disclosure Act, subprime loans, negative amortization loans, 'No-Doc' loans, balloon payments, and/or 'interest only' or teaser loans that also carry a prepayment penalty." *Id.* ¶ 12 n.5. A regression analysis shows that African American borrowers are 2.583 times more likely to receive HCHR loans than a similarly situated white borrower, while Latino borrowers are 3.312 times more likely to receive such loans. *Id.* ¶ 68. That analysis controlled for a variety of independent factors such as credit score, *see id.* ¶ 92 (listing factors controlled for), but it does not control for factors such as job loss, medical hardship, or divorce. *Id.* ¶ 93.[1]

Because HCHR loans are more expensive and riskier than normal-cost, normal-risk loans, borrowers of HCHR loans are more likely to default and enter foreclosure. *Id.* ¶ 88; *see also id.* ¶ 68 (regression analysis shows HCHR loans were more likely to result in foreclosure than non-HCHR loans). HCHR loans from WF were concentrated in minority-heavy neighborhoods. *Id.* ¶ 70. Hence, those neighborhoods have suffered from a higher rate of foreclosure than that in white-heavy neighborhoods. *Id.* ¶¶ 73, 82, 87-88.

C.    Injuries

These foreclosures—as well as vacancies and "short sales" occurring prior to the completion of foreclosure—injured Oakland in three ways. First, they depressed the property value of the foreclosed homes and nearby properties. *Id.* ¶¶ 110-11, 115. The lower property

---

[1] Oakland also alleges that borrowers in minority-heavy neighborhoods were more likely to receive an undesirable loan than borrowers in white-heavy neighborhoods, though Oakland does not plead that such borrowers were similarly situated financially or of different racial groups. FAC ¶ 70.

United States District Court
Northern District of California

1    values then resulted in lower property-tax revenues for Oakland, injuring the city financially.

2    *Id.* ¶¶ 111-12.

3           Second, foreclosed properties resulted in a variety of municipal problems, such as

4    "vagrancy, criminal activity, fire hazards, and threats to public health and safety." *Id.* ¶¶ 131-33.

5    Oakland expended resources to remedy these problems, further injuring the city. *Id.* ¶¶ 130-33,

6    135-39.  These problems further depressed neighborhood property values and therefore had an

7    additional impact on property taxes. *Id.* ¶ 134.

8           Third, disproportionately higher rates of foreclosure for minority borrowers resulted in a

9    disproportionate number of minorities losing their homes; this "impair[ed] the City's goals" of

10   racial integration and non-discrimination in housing, *id.* ¶¶ 103-07, and "adversely impact[ed] the

11   City's numerous programs" in pursuit of those goals, *id.*  ¶¶ 103-07, "neutralizing" spending on

12   those programs. *Id.* ¶¶ 3, 17.

13          Oakland calls the first two injuries "economic injuries" and the third injury "non-economic

14   injuries." *See id.* at ¶¶ 99-139.

15   **III.    _BANK OF AMERICA V. MIAMI_**

16          The principal question before the Court is whether Oakland's injuries were proximately

17   caused by WF's actions under the FHA in light of the Supreme Court's recent decision addressing

18   the FHA's standard for proximate cause in *Bank of America v. Miami*, 137 S. Ct. 1296.[2]  In

19   *Miami*, the City of Miami sued Bank of America and WF under the FHA for intentional and

20   disparate-impact racial discrimination in mortgage lending.  Miami alleged that the banks issued

21   riskier, less favorable loans to black and Latino borrowers as compared to similarly situated white

22   borrowers.  Miami claimed that this discrimination damaged its racial composition and goals for

23   integration and caused a high number of foreclosures, which reduced Miami's property taxes and

24   raised its municipal costs.  Two questions were before the Court:  (1) whether Miami had

25   _____

26   [2] Because the FEHA is "substantially equivalen[t]" to the FHA, absent an indication from the state
     courts to the contrary, the conclusion as to the FEHA claim tracks that of the FHA claim.

27   *Sisemore v. Master Fin., Inc.*, 151 Cal. App. 4th 1386, 1420 (2007); *see also Walker v. City of
     Lakewood*, 272 F.3d 1114, 1131 n.8 (9th Cir. 2001) (holding that "we apply the same standards to

28   FHA and FEHA claims" (citing *Sada v. Robert F. Kennedy Med. Ctr.*, 56 Cal. App. 4th 138, 150
     n.6 (1997)).

prudential standing (also called statutory standing) to bring suit under the FHA, and (2) whether Miami's  injuries were proximately caused by the discriminatory lending, a substantive element of an FHA claim.  *Id.* at 1301.

As to the first question, the Court noted that prudential standing required the plaintiff's claim to at least "arguably" fall within the "zone of interests protected by the law invoked."  *Id.* at 1302 (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1388 (2014)).  The FHA's "zone of interests" turns on the statutory text which permits any person "aggrieved" by a discriminatory housing practice to bring suit.  *Id.* at 1303 (quoting 42 U.S.C. § 3613(a)).  The Court had previously held that an aggrieved person included all who had Article III standing, but Bank of America argued that those decisions were overbroad.  *Id.* (quoting § 3602(i)).  The Court held that even if prudential standing did not extend to all those with Article III standing, Miami's property-tax and municipal-spending injuries nonetheless fell within the FHA's zone of interest and satisfied prudential standing.  *See id.* at 1305 (relying on *Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 95, 110-11 (1979), which held that a village had prudential standing under the FHA where realtors' steering practices caused the village to lose racial balance and threatened to decrease property taxes).  Though not expressed in the opinion, it follows that a finding of prudential standing perforce establishes Article III standing.

As for the question of proximate cause, the Court first noted that claims for damages under the FHA must be proximately caused by the unlawful conduct.  *See id.* at 1305.  It noted that "[i]n the context of the FHA, foreseeability alone does not ensure the close connection that proximate cause requires."  *Id.* at 1306.  Because "[t]he housing market is interconnected with economic and social life," a violation of the FHA would be expected to cause "ripples of harm" that spread beyond a defendant's misconduct.  *Id.*  "Nothing in the statute suggests that Congress intended to provide a remedy wherever those ripples travel."  *Id.*  In assessing proximate cause under the FHA, the "[p]roximate-cause analysis is controlled by the nature of the statutory action."  *Id.* at 1305.  Because "[a] damages claim under the [FHA] is analogous to a number of tort actions recognized at common law," where the Court "ha[s] repeatedly applied directness principles," "proximate cause under the FHA requires 'some direct relation between the injury asserted and the

injurious conduct alleged.'" *Id.* at 1306 (quoting *Holmes v. Sec. Investor Protection Corp.*, 504 U.S. 258, 268 (1992)).  Rephrased, "the general tendency" in suits for damages under statutes analogous to common-law torts "is not to go beyond the first step." *Id.* (quoting *Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 10 (2010)).  The "first step" is measured beginning with the defendant's unlawful conduct.  *See id.* (quoting *Lexmark*, 134 S. Ct. at 1390).  "What falls within that 'first step' depends in part on the 'nature of the statutory cause of action' and an assessment 'of what is administratively possible and convenient.'" *Id.* (citations omitted) (quoting *Lexmark*, 134 S. Ct. at 1390, and *Holmes*, 504 U.S. at 268).

Notwithstanding the fact that the claim of causation leading to Miami's asserted injuries clearly went beyond the "first step," the Court, rather than ordering dismissal, remanded the case for further analysis of proximate cause.  *See id.* at 1301-02, 1306.

## IV.    APPLICATION OF *BANK OF AMERICA V. MIAMI*

In the instant case, the FAC alleges that WF pushed HCHR loans onto minority borrowers at a higher frequency than onto whites.  Minorities accepted these loans at higher rates than whites.  When these borrowers ran into financial hardship (in part because of the higher cost and risk of these loans), WF refused to refinance minority borrowers' loans on favorable terms.  Minority borrowers, having higher loan payments and less flexible terms, defaulted more often than white borrowers and suffered foreclosure at higher rates than white borrowers.  As noted above, Oakland alleges three consequences for the City: (1) foreclosures made the affected properties and neighboring properties less desirable, and their property values dropped, causing Oakland to collect less property tax; (2) criminals, litterers, and others who caused municipal ills were more likely to gather around the foreclosed property, thus causing Oakland to expend law enforcement and other resources to ameliorate these problems; (3) Oakland's goals and spending in programs for non-discrimination in housing were undermined.  WF argues Oakland fails adequately to allege proximate cause.

Oakland asserts two threshold arguments to avoid the thrust of *Miami*'s proximate cause analysis.  First, Oakland argues that it must by definition satisfy proximate cause under the FHA, because it clearly has standing under the FHA.  "It would be illogical for Oakland to have standing

under the FHA to pursue lost property taxes and increased municipal expenses, but still be unable to state a claim for those very same injuries under the FHA's causation standard." Docket No. 116 ("Opp.") at 10; *see also id.* at 8. For support, Oakland cites *Gladstone*, 441 U.S. at 111, which held that a municipality had prudential standing to sue under the FHA where real estate brokers' steering practices disrupted the municipality's "racial balance and stability" and thereby threatened to reduce property values and tax receipts. *Miami* reaffirmed *Gladstone*, noting that prudential standing encompasses anyone who even "arguably fall[s] within the zone of interests" protected by the relevant statute. *Miami*, 137 S. Ct. at 1309-10. In the case of the FHA, prudential standing is defined "as broadly as is permitted by Article III," so as to include "'any person who . . . claims to have been injured by a discriminatory housing practice.'" *Id.* (quoting 42 U.S.C. § 3602(i)).

But while the Court held the City of Miami had standing under the FHA, it also applied the standard for proximate cause on the substantive FHA claim and remanded the case for further analysis. Standing is a separate issue from proximate cause. *Miami* clearly contemplated the possibility that one might satisfy prudential standing yet fall short on proximate cause. The former does not per se suffice to establish the latter as Oakland seems to suggest.

Second, Oakland proposes a standard for proximate cause: "the proper proximate causation standard for the FHA should be a traditional 'but-for' causation test" whereby "the alleged unlawful conduct [is] the but-for cause of the alleged injury and . . . the injury [is] reasonably foreseeable from the unlawful conduct." Opp. at 12. Oakland contends this standard is consistent with *Miami*'s holding that "foreseeability alone" is insufficient. *Id.* (quoting *Miami*, 137 S. Ct. at 1305). Oakland is mistaken. But-for cause is a predicate of proximate cause; it does not add to proximate cause. *See Paroline v. United States*, 134 S. Ct. 1710, 1722 (2014). *Miami* implicitly rejected reliance on cause-in-fact in assessing proximate cause, 137 S. Ct. at 1306 (liability does not extend to every "ripple[] of harm"), and held that foreseeability alone is not the touchstone for proximate cause. Oakland's proposed formulation disregards that holding.

Oakland's reliance on *Paroline v. United States*, 134 S. Ct. 1710 (2014), and *Goodyear Tire & Rubber Co. v. Haeger*, 137 S. Ct. 1178, 1186-87 (2017), to support its argument is

United States District Court
Northern District of California

1    misplaced.  In *Paroline*, the Court cast causation in fact as the "threshold requirement" to the

2    proximate cause analysis.  134 S. Ct. 1722.  It specifically pointed out that proximate cause was

3    "distinct from mere causation in fact."  *Id.*  In *Goodyear*, the Court held that certain judicial

4    sanctions such as attorney's fees must be "compensatory rather than punitive in nature."  137 S.

5    Ct. at 1186.  Thus, only those fees caused by the misconduct may be awarded.  This requires the

6    court to establish a "causal link . . . between the litigant's misbehavior and the legal fees paid by

7    the opposing party."  *Id.*  The required causal link in that context was the but-for standard, *see id.*

8    at 1187; *Goodyear* did not analyze proximate causation as a requisite to recovery of damages

9    under tort law.

10    Oakland also cites *CSX Transportation, Inc. v. McBride*, 564 U.S. 685, 700 (2011).  There,

11    the Supreme Court held that the relevant causation standard for the Federal Employees Liability

12    Act ("FELA") was whether the conduct "played any part" in causing the injury—a sort of but-for

13    standard.  However, that was because FELA's standard "was determined by the statutory phrase

14    'resulting in whole or in part,'" a "straightforward phrase" that was "incompatible" with

15    determinations of "whether a particular cause was sufficiently 'substantial' to constitute a

16    proximate cause."  *Id.* at 696.  Importantly, FELA "does not incorporate 'proximate cause'

17    standards developed in nonstatutory common-law tort actions."  *Id.* at 694 (internal quotation

18    marks omitted).  In contrast, the Court in *Miami* held that the FHA *does* incorporate a proximate

19    cause standard that is explicitly drawn from common-law tort.  *See Miami*, 137 S. Ct. at 1306.

20    *McBride* is therefore inapposite.

21    Oakland argues that the FHA's remedial purpose counsels for a more lenient proximate-

22    cause standard here than in *Holmes* and the other RICO cases.  *See* Opp. at 14.  But a similar

23    argument was rejected in *Holmes*.  In *Holmes*, "SIPC[] reli[ed] on the congressional admonition

24    that RICO be 'liberally construed to effectuate its remedial purposes,'" but that "does not deflect

25    our analysis."  503 U.S. at 274.  "There is . . . nothing illiberal in our construction: We hold not

26    that RICO cannot serve to right the conspirators' wrongs, but merely that the . . . customers, or

27

28

8

SIPC in their stead, are not proper plaintiffs."[3]  *Id.*  In other words, even if a cause of action is remedial in nature, that action must be brought by the "proper plaintiff."  As *Miami* indicates, the same is true with the FHA.  Although the legislative history of the FHA reveals Congress' concerns with the ripples of harm visited upon cities by housing discrimination, including a "[d]eclining tax base, poor sanitation, [and] loss of jobs," 114 Cong. Rec. 2274 (Feb. 6, 1968)), the Supreme Court nonetheless cautioned that "[n]othing in the statute suggests that Congress intended to provide a remedy wherever those ripples travel."  *Miami*, 137 S. Ct. at 1306.

Hence, Oakland's general arguments for a qualitatively different measure of proximate cause cannot be sustained.  The Court must therefore ascertain the proper parameters of proximate cause, grounded in common law.  *Miami*'s citation of prior proximate-cause cases provides some but not conclusive guidance.  *See* 137 S. Ct. at 1306.

## V.      ECONOMIC INJURIES

A.      Length of the Causal Chain

In establishing the applicability of proximate cause, *Miami* cites three Supreme Court cases that interpreted and applied the directness requirement: *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258 (1992), *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451 (2006), and *Hemi Group LLC v. City of New York*, 559 U.S. 1 (2010).

In *Holmes*, the plaintiff was Securities Investor Protection Corporation ("SIPC"), a private corporation charged by statute to reimburse customers of registered broker-dealers who were unable to meet their financial obligations.  *Holmes*, 503 U.S. at 261-62.  SIPC sued Holmes for RICO violations, alleging that Holmes engaged in stock-market fraud, which, when uncovered, caused stock prices to drop.  The price drop resulted in financial difficulties for two registered broker-dealers, which liquidated.  As a result, the broker-dealers were not able to meet their obligations to their customers, who then sought reimbursement from SIPC.  The Court held RICO

[3] The *Holmes* Court additionally expresses its concern that the remedial purpose of RICO would actually be "hobbled" by a broad proximate cause, because it would cause "massive and complex damages litigation[, which would] not only burde[n] the courts, but [would] also undermin[e] the effectiveness of treble-damages suits."  503 U.S. at 274 (alterations in original) (quoting *Associated Gen. Contractors of Cal. v. Cal. State Council of Carpenters*, 459 U.S. 519, 545 (1983)).

United States District Court
Northern District of California

borrowed from the common law in establishing the element of proximate cause.  *See id.* at 267-68.

The proximate-cause question on appeal was whether there was "some direct relation" between

Holmes' fraud and the harm to the customers of broker-dealers (which SIPC had to reimburse).

*Id.* at 268.  In this inquiry, "a plaintiff who complained of harm flowing merely from the

misfortunes visited upon a third person by the defendant's acts was generally said to stand at too

remote a distance to recover."  *Id.* at 268-69.  Given this, "the link is too remote between the stock

manipulation alleged and the customers' harm, being purely contingent on the harm suffered by

the broker-dealers.  That is, the conspirators have allegedly injured these customers only insofar as

the stock manipulation first injured the broker-dealers and left them without the wherewithal to

pay customers' claims."  *Id.* at 271.  This fact put the customers' (and SIPC's) harm "beyond the

first step" and failed to satisfy the directness requirement.  *See id.* at 271-72 (quoting *Associated*

*Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 534 (1983)).

      In *Anza*, mill-products purveyor Ideal Steel Supply sued its primary competitor National

Steel Supply for RICO violations.  547 U.S. at 453-54.  Ideal alleged that National engaged in tax

fraud through the mails and wires and used the proceeds of the fraud to lower its prices.  Ideal, as

National's competitor, was harmed by National's lower prices.  The mail and wire fraud was the

alleged RICO violation by National.  The proximate-cause question was whether National's fraud

proximately caused Ideal's competitive harm.  The Court's analysis focused on the divergence

between the unlawful conduct and the conduct that harmed the plaintiff.  While acknowledging

that Ideal suffered harm when National engaged in the fraud, "[t]he cause of Ideal's asserted

harms . . . is a set of actions (offering lower prices) entirely distinct from the alleged RICO

violation (defrauding the State)."  *Anza*, 547 U.S. at 458.  "National . . . could have lowered its

prices for any number of reasons unconnected to the asserted pattern of fraud. . . . Its lowering of

prices in no sense required it to defraud the tax authority."  *Id.* at 458-59 (listing other reasons why

National might have lowered its prices).  "Likewise, the fact that a company commits tax fraud

does not mean the company will lower its prices . . . ."  *Id.* at 458-59 (listing uses to which the

fraudulently retained money might have been employed).  The harm suffered by Ideal resulted

from lower prices, an arguably incidental effect which did not necessarily flow from the RICO

United States District Court
Northern District of California

1  fraud.

2      *Hemi* applied and extended *Anza* in another RICO case.  559 U.S. at 1.  In *Hemi*, the City

3  of New York had imposed taxes on sales of cigarettes.  Out-of-state cigarette sellers were not

4  required to collect and remit the tax themselves; that onus was on the purchasers.  Instead, sellers

5  were required to file a report with a New York state agency detailing each purchase by state

6  residents.  New York State would then forward the information to New York City, which would

7  then be able to locate residents who had failed to pay the tax.  *Id.* 559 U.S. at 5-6.  New York City

8  sued Hemi, an out-of-state cigarette seller, alleging that Hemi did not file the required reports with

9  the state agency and thereby caused the City to lose significant sums in uncollectable tax revenue.

10  *Id.*  Using *Anza*'s analysis, the Court held that the City's injury failed the directness requirement.

11  *Id.* at 10.  "The conduct directly responsible for the City's harm was the customers' failure to pay

12  their taxes.  And the conduct constituting the alleged fraud was Hemi's failure to file . . . reports."

13  *Id.* at 11.  "Thus, as in *Anza*, the conduct directly causing the harm" was "distinct" from the

14  unlawful conduct.  *Id.*  *Hemi* found that this would have been sufficient to destroy proximate

15  cause, but the conduct was even more remote from the injury, because "the City's theory of

16  liability rests not just on separate *actions*, but separate actions carried out by separate *parties*"—

17  the customer and Hemi.  *Id.*  Worse still, these parties' actions directly injured different entities:

18  Hemi's action directly injured the State, to whom his obligation to file reports was owed, while the

19  customers' actions directly harmed the City, stretching the analysis to include a "*fourth* party."  *Id.*

20  The *Hemi* Court did not find directness, and proximate cause was not satisfied.

21      The Ninth Circuit followed the general proximate cause framework focusing on the nature

22  and quality of the chain of causation.  *Canyon Cty. v. Syngenta Seeds, Inc.*, 519 F.3d 969 (9th Cir.

23  2008).  In *Canyon County*, the county sued four companies and an individual for hiring and

24  harboring undocumented immigrants in the county, which allegedly imposed health-care and law-

25  enforcement expenses on the county.  Similar to the cases above, the Ninth Circuit found that the

26  unlawful conduct did not directly cause the injury.  "[J]ust as in *Anza*, the cause of the plaintiff's

27  asserted harms is a set of actions (increased demand by people within Canyon County for public

28  health care and law enforcement services) entirely distinct from the alleged RICO violation (the

11

1   defendants' knowing hiring of undocumented workers)." *Id.* at 982.

2          Three district court decisions have applied *Miami* in finding government injuries similar to

3   those asserted here too indirect to establish proximate cause.  *See Cty. of Cook v. HSBC N. Am.*

4   *Holdings Inc.*, No. 14 C 2031, 2018 WL 2431987 (N.D. Ill. May 30, 2018); *Cty. of Cook v. Bank*

5   *of Am. Corp.*, No. 14 C 2280, 2018 WL 1561725 (N.D. Ill. Mar. 30, 2018); *Cty. of Cook v. Wells*

6   *Fargo & Co.*, No. 14 C 9548, 2018 WL 1469003 (N.D. Ill. Mar. 26, 2018).  For instance, in

7   *County of Cook v. Wells Fargo*, Cook County alleged that WF targeted minority borrowers in the

8   county for HCHR loans, resulting in foreclosures that, *inter alia*, decreased the county's property-

9   tax revenue, increased municipal expenditures related to crime and blight, and increase the

10  county's costs for processing foreclosures.  2018 WL 1469003, at *5, *9.  The court held that the

11  property-tax and municipal-expenditure injuries involved too many intervening factors such that

12  proximate cause was not satisfied.  But it also held that the increased foreclosure processing costs

13  "fall[] within the first step" and satisfy proximate cause, "despite running through an 'intervening

14  link of injury' to borrowers."  *Id.* at *5 (quoting *Lexmark Int'l, Inc. v. Static Control Components,*

15  *Inc.*, 134 S. Ct. 1377, 1394 (2014)).  This is because "foreclosures . . . necessarily require[] the

16  expenditure of County funds," *id.* at *6, in order to "post[] foreclosure and eviction notices,

17  serv[e] foreclosure summonses, execut[e] evictions, and process[] foreclosure suits."  *Id.* at *5.

18  And while the court acknowledged that it could be difficult to determine the number of

19  foreclosures attributable to the discrimination, statistical analysis could well overcome that hurdle.

20  *See id.* at *7, *8.

21          As recognized by *County of Cook v. Wells Fargo*, the fact that an injury "runs through a

22  separate injury" to a third party "does not by itself require dismissal on proximate cause grounds."

23  *Id.* at *6.  For instance, in *Lexmark*, 134 S. Ct. 1377, Static Control brought a counterclaim against

24  Lexmark for false advertising in violation of the Lanham Act.  Lexmark sold toner cartridges and

25  competed with remanufacturers who refurbished used cartridges for sale.  Static Control produced

26  parts for remanufacturers' use in the refurbishment process.  Static Control alleged, *inter alia*, that

27  Lexmark warned remanufacturers that it was illegal to refurbish Lexmark cartridges and that this

28  caused remanufacturers and therefore Static Control to lose sales.  On appeal, the Supreme Court

United States District Court
Northern District of California

12

held that proximate cause was met.  In doing so, it addressed two points of attenuation: Static Control's harm was contingent on the harm to remanufacturers, which in turn was contingent on the harm to consumers.  As to the first point of attenuation, the Court chose to depart from the "general tendency not to stretch proximate causation beyond the first step," because there was "something very close to a 1:1 relationship" between the harm suffered by the remanufacturers and Static Control.  *Id.* at 1394 (internal quotation marks omitted) (quoting *Holmes*, 503 U.S. at 271).  This 1:1 relationship arose because the parts manufactured by Static Control "both (1) were necessary for, and (2) had no other use than, refurbishing Lexmark toner cartridges."  *Id.*  "[I]f the remanufacturers sold 10,000 fewer refurbished cartridges because of Lexmark's false advertising, then it would follow more or less automatically that Static Control sold 10,000 fewer microchips for the same reason, without the need for any 'speculative . . . proceedings' or 'intricate, uncertain inquiries.'"  *Id.* (quoting *Anza*, 547 U.S. at 459-60).  There was not the type of "discontinuity" that "ordinarily" exists between the injury to a direct victim and the injury to an indirect victim.  *Id.*  Under this "relatively unique" circumstance, "the remanufacturers are not 'more immediate victim[s]' than Static Control."  *Id.* (alteration in original) (quoting *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 658 (2008)).  As to the fact that "all commercial injuries from false advertising are derivative of those suffered by consumers," the Court was clear that "the intervening step of consumer deception is not fatal to the showing of proximate cause" because "the Lanham Act authorizes suit only for commercial injuries."  *Id.* at 1391.[4]

B.  *Holmes* Factors

        In addition to the length of the causal chain, *Holmes* examined three factors that bear on proximate cause:  (1) the difficulty of "ascertain[ing] the amount of a plaintiff's damages attributable to the [unlawful conduct], as distinct from other, independent factors," (2) whether

---

[4] Oakland's citation of *Paroline v. United States*, 134 S. Ct. 1710 (2014), as a case in which the chain of causation was long yet satisfied proximate cause is misplaced.  Opp. at 15.  The unlawful conduct at issue in *Paroline* was possession of child pornography; mere possession of child pornography, even without viewing, could inflict emotional distress on the victim, given the victim's loss of control and autonomy.  Further, as in *Lexmark*, possession of child pornography is "both (1) . . . necessary for, and (2) ha[s] no other use than" viewing of the material.  *Lexmark*, 134 S. Ct. at 1394.  And the victim's knowledge of the possession and viewing of the pornography is inherently implicit in the filing of the suit.  *Paroline*'s causal chain was therefore direct.

United States District Court
Northern District of California

permitting the suit to proceed "would force courts to adopt complicated rules apportioning damages among plaintiffs at different levels of injury from the violative acts, to obviate the risk of multiple recoveries," and (3) whether the "general interest in deterring injurious conduct" justifies grappling with these complex issues, accounting for the extent to which more directly injured victims can "generally be counted on to vindicate the law." *Holmes*, 503 U.S. at 269. These factors were the "motivating principle[s]" for the directness requirement in *Holmes*, and appear to function as a cross check on the analysis of the length of the causal chain. *See Anza*, 547 U.S. at 458-60; *Canyon Cty.*, 519 F.3d at 982-83.

In *Holmes*, all three factors cut against a finding of proximate cause. On the first factor, allowing the suit to move forward would require the district court to determine to what extent the broker-dealers' inability to pay their customers "was the result of the alleged conspiracy to manipulate, as opposed to, say, the broker-dealers' poor business practices or their failures to anticipate developments in the financial markets." 503 U.S. at 273. Even if this calculation could be done, under the second factor, "the district court would then have to find some way to apportion the possible respective recoveries by the broker-dealers and the customers." *Id.* As to the third factor, directly injured broker-dealers could be counted on to bring suit to vindicate the law. *See id.* All three factors therefore militated against proximate cause.

In *Anza*, the *Holmes* factors also confirmed the Court's finding of no proximate cause. The corporate plaintiff had alleged that it lost sales because its competitor—the defendant—lowered its prices due to tax fraud. As to the first *Holmes* factor, the Court noted that the defendant "could have lowered its prices for any number of reasons unconnected to the asserted pattern of fraud," and that the plaintiff's lost sales could be due to "many reasons." 547 U.S. at 458-59. Calculating the portion of price drop due to the fraud and then the portion of the lost sales due to the price drop would be a "speculative" and "complex assessment," and the directness requirement was "meant to prevent these types of intricate, uncertain inquiries." *Id.* at 459-60. The third *Holmes* factor also counseled against finding proximate cause in *Anza*, because the state, being the victim of the tax fraud, could be expected to vindicate the law. *See id.* at 460. As for the second factor, there was no "appreciable risk of duplicative recoveries," but that was not sufficient to establish

1  proximate cause.  *Id.* at 459.

2       The *Holmes* factors also indicated that proximate cause was not satisfied in *Canyon*

3  *County*.  As for the first factor, the difficulty of attributing the county's damages to the

4  employment of unauthorized workers, "the asserted causal chain in this instance is quite

5  attenuated, and there are numerous other factors that could lead to higher expenditures by the

6  County."  519 F.3d at 982.  Furthermore, to calculate the portion of the county's injuries

7  attributable to the plaintiffs' unlawful conduct, the district court could not "simply estimat[e] the

8  number of undocumented immigrants employed by the companies and their average usage of

9  County services."  *Id.* at 983.  Instead, "the court would have to construct the alternative scenario

10  of what would have occurred" if the companies had employed legally authorized workers, "an

11  intricate, uncertain inquiry" that militated against finding proximate cause.  *Id.* (internal quotation

12  marks omitted).  As for the second factor, the risk of multiple recoveries, the court noted even

13  though the county's harm did not flow through intervening victims, proximate cause can fail even

14  where the harm is not "passed-on" or contingent on harm to another.  *See id.*  The court did not

15  analyze the third factor.  *See id.*

16  C.     The Instant Case

17          1.     Length of the Causal Chain

18       The causal relationship between WF's conduct and Oakland's alleged harm is indirect and

19  goes through several links.  As in *Holmes* and the cases cited above, the economic injuries here are

20  contingent, *inter alia*, on the harm suffered by a third party, namely the minority borrowers.  Both

21  the depressed property-tax revenues and the increased municipal expenditures were the result of

22  minority borrowers' foreclosures.  As in *Hemi*, where "[t]he conduct directly responsible for the

23  City's harm was the customers' failure to pay their taxes," 559 U.S. at 11, the immediate conduct

24  here that ultimately resulted in Oakland's harm was the homeowners' failure to pay their loans.

25  The harms suffered by Oakland—*e.g.*, lower property taxes and increase police costs—are

26  "entirely distinct" from the WF's unlawful discrimination in the issuance of HCHR loans.  *Canyon*

27  *Cty.*, 519 F.3d at 982.  Indeed, as in *Hemi*, various actions in the chain of causation here were

28  carried out by multiple parties: the unlawful discrimination was carried out by WF, leading to

default by WF's customers, which in turn led to foreclosures by WF, which led to lower property values and consequently lower property taxes collectable by Oakland.  Likewise, the alleged law-enforcement costs incurred by Oakland requires additional links in the causal chain:  evictions and vacancies after foreclosure by the lender or new owner, resulting in crime and code violations by law-breakers (not the homeowners), resulting in increased municipal law enforcement responses and costs and lowering property values causing property owners in affected neighborhoods to pay less property taxes.  As in *Hemi*, Oakland suffered economic harm at the hands of third and fourth parties.  Unlike *Lexmark International*, there is no obviously direct 1:1 relationship between harm to direct victims and the harm to the plaintiff.  Accordingly, the length of the causal chain counsels against a finding of proximate cause.

On the other hand, while Oakland's injuries are several steps removed from WF's conduct, that fact does not appear to be determinative.  Similar facts were present in *Miami*, yet as noted above, the Supreme Court remanded the case instead of simply holding there was no proximate cause as matter of law.  This suggests that despite the lengthy chain of causation, there may be factual allegations in this kind of case that can survive a 12(b)(6) motion.  Thus, while the contingent nature of Oakland's economic injuries counsels against proximate cause, it does not end the inquiry.  Instead, the analysis must proceed to the *Holmes* factors.

### 2.    *Holmes* Factors

The first *Holmes* factor requires this Court to determine whether it would be difficult to ascertain the portion of Oakland's economic damages resulting from WF's unlawful conduct.  The concern underlying the first *Holmes* factor is uncertainty and difficulty in determining damages attributable to the defendant's unlawful conduct.  Here there are two factors that mitigate this concern.  First, unlike *Holmes* and *Anza*, the injury here is not individualized; it is aggregative; where damages are aggregative, precision is not expected.  Invariably some approximation is required.  While the fact of aggregative injury itself does not obviate proximate cause analysis as *Hemi* and *Canyon County* illustrate, there is an additional consideration here.  Oakland suggests based on aggregative data that it can prove there is a clear quantifiable link between WF's challenged practice and foreclosure rates and consequent harm to the city.  In particular, Oakland

has proffered a specific statistical analysis in regard to its property-tax injury.  The FAC describes

a regression analysis that links Oakland's alleged unlawful conduct to an increase in foreclosures.

*See* FAC ¶¶ 12, 68-69, 90-92.  Furthermore, the increase in foreclosures can be linked to

Oakland's decreased property taxes by way of Hedonic analysis.  *See id.* ¶¶ 120-27.  *Anza* and

*Canyon County* did not address this situation where there is an alleged provable and quantifiable

causal link between the defendant's conduct and plaintiff's injury despite there being multiple

links in the chain.[5]  Hence, the first *Holmes* factor counsels in favor of proximate cause, at least

with respect to Oakland's claim of lost tax revenues for which it has alleged the existence of an

available statistical model.

To be sure, the Ninth Circuit has referenced the relevance (or not) of statistical analysis to

the first *Holmes* factor.  In *Oregon Laborers-Employers Health & Welfare Trust Fund v. Philip

Morris Inc.*, 185 F.3d 957 (9th Cir. 1999), employee health and welfare benefit plans sued tobacco

companies and related entities under RICO to recover the cost of treating the plans' beneficiaries

for smoking-related injuries. The court held that the plaintiffs failed to satisfy proximate cause.  In

analyzing the first *Holmes* factor, the court quoted the Third Circuit:

> The Funds' alleged damages are said to arise from the fact that the
> tobacco companies prevented the Funds from providing smoking-
> cessation or safer smoking information to their participants . . . . In
> order to calculate the damages . . . the Funds must demonstrate how
> many smokers would have stopped smoking if provided with
> smoking-cessation information, how many would have begun
> smoking less dangerous products . . . .
>
> It is apparent why the Funds argue that they can demonstrate all of
> this through aggregation and statistical modeling: it would be
> impossible for them to do so otherwise.  Yet we do not believe that
> aggregation and statistical modeling are sufficient to get the Funds
> over the hurdle of the *AGC* factor focusing on whether the "damages
> claim is . . . highly speculative."

---

[5] In *County of Cook v. Wells Fargo*, the district court acknowledge that statistical analysis of
aggregative data might establish "the likelihood that a loan modification denied would lead to
foreclosure," 2018 WL 1469003, at *8, and thus sufficiently link the Wells Fargo conduct to at
least part of the county's harm.  Although the court found that less direct injuries such as loss of
tax revenues were not proximately caused by Wells Fargo, the court was not presented with
specific statistical analysis as alleged in this case linking Wells Fargo's conduct with the loss of
tax revenues.

*Id.* at 965 (quoting *Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.*, 171 F.3d 912, 929 (3d Cir. 1999)).  The language in the block quotation suggests that the possibility of statistical analysis may not aid the plaintiff in establishing proximate cause under the first *Holmes* factor.  However, this language appears to be dicta.  Nothing in the rest of the Ninth Circuit's decision refers to any statistical analysis or any argumentation thereon.  Moreover, the fact that statistical modeling for quantifying the city's harm was asserted in *Miami*, *see Miami*, 137 S. Ct. at 1302, could well have been a consideration in the Supreme Court's decision to remand rather than order dismissal, particularly since all the harms asserted by Miami were beyond the "first step" of injury; remand was required to sort out "first step" from indirect injuries as was done in *County of Cook v. Bank of America*, *County of Cook v. Wells Fargo*, and *County of Cook v. HSBC North America Holdings*.

Hence, the role of statistical analysis in proximate cause analysis appears to be an open question.  Because statistical analysis plausibly can permit the calculation of Oakland's property-tax injury caused by WF's policies with some reasonable certainty, the first factor supports proximate cause, at least at the pleading stage.  That is not the case, however, for Oakland's municipal-expenditure injury, for which Oakland has proffered no statistical analysis.

The second *Holmes* factor concerns the need to "adopt complicated rules apportioning damages among plaintiffs at different levels of injury from the violative acts."  *Holmes*, 503 U.S. at 269.  So phrased, this concern appears to be focused on the dangers of overlapping and duplicative damages.  *Cf. Ill. Brick Co. v. Illinois*, 431 U.S. 720 (1977) (indirect purchasers of concrete blocks could not recover higher costs passed on from their suppliers, which were the victims of a price-fixing scheme).  Here, Oakland's injuries are distinct and different from those suffered by the minority borrowers.  Unlike indirect buyers in *Illinois Brick*, Oakland's economic injuries are not the same injury passed on from the borrowers to Oakland; recovery by Oakland would not threaten double compensation for the same injury.  The second factor does not weigh against proximate cause.

The third factor does weigh against proximate cause; minority borrowers are directly injured victims who can bring suit.  In fact, the borrowers have evidently already achieved by way

United States District Court
Northern District of California

of a consent order in a suit brought by the United States.  Docket No. 107 ("Mot.") at 11; *see* Mot., Exs. A (consent order establishing $125 million relief fund for affected borrowers), B (agreement to terminate consent order).  Considering the third factor's focus on deterrence and vindication of the law even without Oakland's suit, this factor weighs against proximate cause.

### 3.   Conclusion

On balance, the property-tax injury survives the pleading stage because Oakland's proffered statistical analyses have the potential to provide certainty to the damages calculation.  Of course, WF is not precluded from challenging proximate cause on a fuller record (including close analysis of Oakland' statistical model(s)).  At this the pleading stage, however, the motion to dismiss is **DENIED** as to the property-tax injury.

As for the municipal-expenditure injury, Oakland has not proffered any statistical analyses comparable to those in the property-tax analysis.  The first *Holmes* factor weighs against Oakland, along with the basic context of its harm being indirect and derivative.  Moreover, as noted above, the municipal expenditure harm contains more links including intervening conduct of additional actors (*e.g.*, criminals who destroy or deface vacant, foreclosed homes) than the claim for property-tax loss.  For that reason, claims based on the municipal-expenditure injury are **DISMISSED WITHOUT PREJUDICE** to the extent they seek damages.

While *Miami*'s directness requirement appears to apply to claims for damages, it does not appear to extend to claims for injunctions or declaratory relief, *see Miami*, 137 S. Ct. at 1305-06 (holding that "[a] damages claim under the [FHA]" is "analogous to a number of tort actions" to which the directness requirement applies (quoting *Curtis v. Loether*, 415 U.S. 189, 195 (1974))), and WF makes no argument that it does.  Rather, WF's main complaint regarding injunctive relief is that Oakland has not specified what injunctive relief would entail.  *See* Docket No. 130, at 29-31 ("I don't know what they want as an injunction.  We are certainly willing to go forward, if the money claims are dismissed, to talk about what injunctive relief might be appropriate . . . .").  Therefore, WF's motion is **DENIED** as to the claims based on the municipal-expenditure injuries that seek injunctive and declaratory relief.

The non-economic injuries are analyzed below.

19

## VI.      NON-ECONOMIC INJURIES

In addition to lowering property taxes and increasing criminal and code enforcement costs, Oakland also alleges that the discriminatory lending harmed Oakland's goals and programs related to fair housing—what Oakland calls its non-economic injuries.  Specifically, Oakland alleges that WF's discriminatory lending "wast[ed] or neutralized" Oakland's spending to promote non-discriminatory housing, FAC ¶ 17, by "undermin[ing] the City's use of resources in support of fair housing, rendering the expenditures a nullity and warranting compensation."  *Id.* ¶ 105.  Oakland also alleges generally that the prohibited lending practices "adversely impacted" its "numerous programs designed to promote fair housing" and to assist low-income homebuyers.  *Id.* ¶¶ 104-05.  WF's discriminatory lending "interfere[d] with the City's ability to achieve these important objectives."  *Id.* ¶ 107.

WF challenges Oakland's standing under Article III to assert these non-economic injuries for Article III standing.

To support standing, Oakland cites *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982).  In *Havens*, the defendant Havens Realty Corp. owned and operated two apartment complexes.  Three individuals, as well as an organization called HOME, sued Havens, alleging that it engaged in racial steering in violation of the FHA.  HOME was a nonprofit organization dedicated to "equal opportunity in housing," in furtherance of which it operated a housing-counseling service and investigated housing-discrimination complaints.  *Id.* at 368.  HOME's standing was based on the allegation that "Plaintiff HOME has been frustrated by defendants' racial steering practices in its efforts to assist equal access to housing through counseling and other referral services.  Plaintiff HOME has had to devote significant resources to identify and counteract the defendant's [sic] racially discriminatory steering practices."  *Id.* at 379 (alteration in original) (quoting the appellate record).  The Court held that this allegation established HOME's injury in fact, because it alleged that Haven's steering practices "perceptibly impaired HOME's ability to provide counseling and referral services."  *Id.*  "Such concrete and demonstrable injury to the organization's activities— with the consequent drain on the organization's resources" fulfilled the injury-in-fact requirement.  *Id.*  Thus, under *Havens*, an organization satisfies injury in fact if it demonstrates both "(1)

United States District Court
Northern District of California

frustration of its organizational mission; and (2) diversion of its resources to combat the particular housing discrimination in question."  *Smith v. Pac. Props. & Dev. Corp.*, 358 F.3d 1097, 1105 (9th Cir. 2004); *cf. La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010) (litigation costs to challenge the conduct do not qualify as diversion of resources).

The Ninth Circuit has addressed the parameters of organizational standing.  In *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006 (9th Cir. 2013), three organizational plaintiffs challenged Arizona Revised Statutes § 13-2929, a part of Arizona S.B. 1070 that criminalized harboring and transporting unauthorized aliens within Arizona.  All three organizations had diverted resources to educate their members about § 13-2929.  *See id.* at 1018.  In addition, § 13-2929 frustrated their programs and organizational missions to offer shelter and transportation services to unauthorized aliens.  This was sufficient to establish standing.

In *Fair Housing Council of San Fernando Valley v. Roommate.com, LLC*, 666 F.3d 1216 (9th Cir. 2012), two nonprofit organizations sued Roommate.com, a service that helped users find roommates.  The plaintiffs alleged that Roommates.com violated the FHA by permitting its users to filter potential roommates by sex, sexual orientation, and familial status.  The Ninth Circuit held that the organizations had Article III standing to sue, because they had expended resources to investigate the alleged violations and launch educational and outreach campaigns in response.  *See id.* at 1219; *see Smith*, 358 F.3d at 1105-06 (organization possessed standing to sue for defendant's violation Fair Housing Amendments Act where the violation frustrated organization's "principal purpose" of eliminating discrimination against disabled persons and where the organization diverted resources to promote awareness of and compliance with accessibility laws); *Fair Housing of Marin v. Combs*, 285 F.3d 899, 905 (9th Cir. 2002) (nonprofit organization possessed standing to sue for housing discrimination where it diverted resources to investigate and counteract defendant's discrimination).

In the case at bar, Oakland has not specifically alleged that it was required to divert resources to "combat the particular housing discrimination in question."  *Smith*, 358 F.3d at 1105.  Instead, Oakland alleges that WF's conduct harmed "the ability of minority residents to own

21

United States District Court
Northern District of California

homes" in Oakland, "the City's goals to assure that racial factors do not" affect individuals' ability to find housing, "the City's numerous programs designed to promote fair housing and a safe, integrated community," and Oakland's objective of "identify[ing] and thwart[ing] predatory lending practices." FAC ¶¶ 103-05. It also alleges that WF's conduct "directly undermines the City's use of resources in support of fair housing, rendering the expenditures a nullity and warranting compensation." *Id.* ¶ 105. There are no allegations, however, that WF's conduct caused the City to divert resources toward combating WF's housing discrimination.

Although the FAC mentions diversion of resources several times, each mention regards the diversion of resources to address blight conditions, *see id.* ¶¶ 3, 129, 167; *see also* Opp. at 21, and not to "combat the particular housing discrimination in question." *Smith*, 358 F.3d at 1105. Oakland's use of resources to combat crime, fires, and code violations, at bottom, is an extension of the municipal-expenditure portion of the economic injury addressed above. *Compare with Valle del Sol*, 732 F.3d at 1018 (organizations expended resources to educate members about the challenged statute); *Roommate.com, LLC*, 666 F.3d at 1219 (organizations spent resources investigating the violation and launching educational and advocacy campaigns in response). Oakland does not allege a diversion of resources specifically in response to advance its fair-housing program or particular efforts to assist low-income homebuyers. It does not allege it had to, *e.g.*, devote additional resources to counsel foreclosed homeowners, investigate claims of lending discrimination, or promote awareness of WF's lending practices.

Finally, though the loss of a municipality's "racial balance and stability" constitutes an injury in fact, *Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 111 (1979), Oakland has not alleged that it suffered such a loss. *See* FAC; Docket No. 130 (Hearing Transcript) at 49 (Oakland agreeing that it has not alleged an impact on its racial composition). Indeed, at least in the short run, the availability of financing (though on unfavorable terms) could well have increased minority homeownership in Oakland.

Hence, the Court **DISMISSES WITHOUT PREJUDICE** Oakland's claims to the extent they are based on the non-economic *Havens* injuries. Because Oakland has not sufficiently alleged standing for claims based on its non-economic harms, the Court does not reach the

proximate-cause issue for those harms.

## VII.    DISPARATE-IMPACT CLAIM

As part of its motion to dismiss, WF argues that the Court should dismiss Oakland's claim for disparate-impact discrimination. Oakland responds that the law of the case doctrine bars reconsideration of the WF's argument, because the Court had previously determined that Oakland stated a disparate-impact claim in its initial Complaint. *See* Docket No. 38.

A.    Law of the Case

Under the law of the case doctrine, "a court is generally precluded from reconsidering an issue that has already been decided by the same court." *Thomas v. Bible*, 983 F.2d 152, 154 (9th Cir. 1993). The district court's decision to apply or not apply the law of the case is discretionary. *See Ingle v. Circuit City*, 408 F.3d 592, 594 (9th Cir. 2005).

The law of the case doctrine does not apply here, because Oakland's FAC substantially revised the initial Complaint's disparate-impact allegations, removing many of its complained-of practices and policies and substituting in new ones. *Compare* Docket No. 1 ¶ 22, *with* FAC ¶¶ 39, 50. Whether the new allegations pass muster is not "an issue that has already been decided." *Thomas*, 983 F.2d at 154; *see King v. Wang*, No. 2:14-cv-1817 KJM DB P, 2017 WL 3188949, at *3 (E.D. Cal. July 27, 2017) (holding that the law of the case does not apply, because "the allegations in the complaint and second amended complaint are sufficiently different"), *report and recommendation adopted*, 2017 WL 4386868 (E.D. Cal. Oct. 3, 2017).

B.    Alleged Practices and Policies

A disparate-impact claim relying on statistical evidence must "point to a defendant's policy or policies causing [the] disparity." *Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Projects, Inc.*, 135 S. Ct. 2507, 2523 (2015). At the pleading stage, a disparate-impact plaintiff must "allege facts . . . or produce statistical evidence demonstrating a causal connection" "between the . . . policy and the disparate impact." *Id.* at 2423-24.

The FAC alleges that WF "engaged in numerous facially neutral lending practices" which resulted in a disparate impact on minority borrowers by:

> a.   providing loan officers discretion to place borrowers in more

United States District Court
Northern District of California

expensive and riskier loans than the borrowers qualified for;

b. providing loan officers discretion to sell lender credits without disclosing the true effect of the pricing of those credits;

c. marketing certain more expensive or riskier loan products to residents in predominantly minority neighborhoods;

d. utilizing a compensation scheme that incentivized loan officers to sell more expensive and riskier loans than borrowers qualified for;

e. requiring substantial prepayment penalties that prevent borrowers whose credit has improved from refinancing their discriminatory loan to a prime loan;

f. charging excessive points and fees that are not associated with any increased benefits for the borrowers; and

g. providing loan officers with information about loan pricing that is higher than the lowest price Wells Fargo could offer the borrowers.

FAC ¶ 39.  The FAC further alleges that WF loan officers, encouraged by WF's compensation plan to sell HCHR loans, *see id.* ¶ 48, "used their discretion to sell more expensive FHA loans to minority borrowers" by "us[ing] race and educational background as proxies for their ability to sell more expensive loan products."  *Id.* ¶¶ 44, 47.  The more expensive loans often had high closing costs that led the borrower to purchase lender credits, a kind of loan to which minority borrowers were especially receptive.  *See id.* ¶¶ 46, 47.

Exacerbating this situation, the FAC alleges that WF is responsible for various "omissions and failures to act . . . to combat against the discriminatory effects of its conduct."  FAC ¶ 50. These omissions are:

a. knowing about lending practices that either created high risk and higher cost loans to minorities compared to comparably credit situated white borrowers or failing to adequately monitor the Bank's practices regarding mortgage loans, including but not limited to originations, marketing, sales, and risk management;

b. failing to underwrite loans based on traditional underwriting criteria such as debt-to-income ratio, loan-to-value ratio, FICO score, and work history;

c. failing to prudently underwrite hybrid adjustable-rate mortgages ("ARMs"), such as 2/28s and 3/27s;

d. failing to prudently underwrite refinance loans, where borrowers substitute unaffordable mortgage loans for existing mortgages that they are well-suited for and that allow them to build equity;

e. failing to monitor and implement necessary procedures within Wells Fargo's Internal Audit, Corporate Risk, Human Resources, Law Department, and Board of Directors throughout the Community Banking segment, which includes Wells Fargo's retail mortgage banking business responsible for the unlawful activities set forth herein, to ensure compliance with federal fair lending laws;

f. failing to abide by the terms of Wells Fargo's Vision & Values,

1     which purportedly guides Defendants' business practices and
      relationships with customers; and

2     g.   failing to ensure that Wells Fargo's decentralized organizational
           structure was capable of properly monitoring mortgage lending
3          activities within Community Banking.

4     *Id.*

5          Together, these practices caused a "statistically significant adverse effect on minority

6     borrowers." *Id.* ¶ 51.  These allegations draw a sufficient causal link between the specific policies

7     and practices and the disparate impact on minority borrowers for pleading purposes.

8     C.    Delegation of Discretion as the Basis for Disparate-Impact Claim

9          The parties debate whether giving loan officers discretion can constitute a "policy or

10    practice" that can support a disparate-impact claim.  WF argues it is not, relying on *Wal-Mart*

11    *Stores, Inc. v. Dukes*, 564 U.S. 338 (2011).  In *Dukes*, the plaintiffs alleged that Wal-Mart gave

12    local supervisors broad discretion over pay and promotion decisions and that the supervisors

13    exercised their discretion in a biased manner, resulting in a disparate impact on female employees.

14    The plaintiffs sought certification of a class of all female Wal-Mart employees in the United

15    States.  Class certification requires "commonality," which requires the class to have suffered "the

16    same injury" such that their claims "depend upon a common contention" that is "capable of

17    classwide resolution."  *Id.* at 350.

18         The Court held that the *Dukes* plaintiffs had not satisfied this requirement for class

19    certification, because the "'policy' of allowing discretion" is "the opposite of a uniform

20    employment practice" that would have inflicted the "same injury" on the entire class.  *Id.* at 355

21    (emphasis omitted).  This is so because managers are likely to exercise their discretion in varied

22    ways; some may intentionally discriminate or create disparate impacts, while others may not, *see*

23    *id.*, so that it was "quite unbelievable" that all female Wal-Mart employees would have suffered

24    the same injury.  *Id.* at 356.  The Court recognized, however, that a policy of delegating discretion

25    may satisfy commonality where plaintiffs "identif[y] a common mode of exercising discretion that

26    pervades the entire company," such as "some common direction."  *Id.*  Where plaintiffs are able to

27    "identif[y]" this "common mode," they establish that the class suffered the "same injury."  *Id.*; *cf.*

28    *Ellis v. Costco Wholesale Corp.*, 285 F.R.D. 492, 518 (N.D. Cal. 2012) (holding that "absolute

United States District Court
Northern District of California

1  uniformity" in the exercise of discretion is not needed for class certification, given the "common

2  practices and policies [that] . . . affect and guide that discretion").  But the *Dukes* plaintiffs failed

3  to identify such a common direction.  *See Dukes*, 564 U.S. at 356.  Moreover, the Court noted

4  even the statistical disparities identified by the plaintiffs failed to establish commonality because

5  disparities did not exist in each of Wal-Mart's stores.  Thus, the class-certification requirements

6  were not satisfied.

7       *Dukes* is not controlling here because the issue presently before the Court is not

8  commonality and class certification, but whether a substantive claim of disparate impact has been

9  stated for purposes of Rule 12(b)(6).  To be sure, the Court in *Dukes* noted:

> In the landmark case of ours which held that giving discretion to
> lower-level supervisors can be the basis of Title VII liability under a
> disparate-impact theory, the plurality opinion *conditioned* that
> holding on the corollary that merely proving that the discretionary
> system has produced a racial or sexual disparity *is not enough*.
> "[T]he plaintiff must begin by identifying the specific employment
> practice that is challenged."  That is all the more necessary when a
> class of plaintiffs is sought to be certified.  Other than the bare
> existence of delegated discretion, respondents have identified no
> "specific employment practice"—much less one that ties all their 1.5
> million claims together.  Merely showing that Wal-Mart's policy of
> discretion has produced an overall sex-based disparity does not
> suffice.

*Id.* at 357 (citation omitted) (quoting *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 994

(1988) (plurality opinion), and citing *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 656

(1989)).  Importantly, however, the Ninth Circuit held after *Watson* that delegating discretion is a

"specific employment practice properly subject to a disparate impact analysis."  *Rose v. Wells*

*Fargo Co.*, 902 F.2d 1417 (9th Cir. 1990).  *Rose* appears to be good law notwithstanding the quote

from *Dukes*; *Dukes* acknowledged the distinction between the substantive law of disparate-impact

discrimination and class certification: "in appropriate cases, giving discretion to lower-level

supervisors can be the basis of Title VII liability under a disparate-impact theory . . . .  But the

recognition that this type of Title VII claim 'can' exist does not lead to the conclusion that *every*

*employee* in a company using a system of discretion has such a claim in common."  *Id.* at 355

(internal quotation marks omitted) (emphasis added) (quoting *Watson*, 487 U.S. at 990-91).  *Dukes*

addressed class certification, not substantive disparate impact analysis.  Subsequent to *Dukes*,

United States District Court
Northern District of California

1    courts have applied disparate-impact theory to varying circumstances involving delegated

2    discretion.  *See McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 672 F.3d 482, 489

3    (7th Cir. 2012) (teaming policy permitting employees to form their own teams can be the basis of

4    disparate-impact suit), *abrogated on other grounds as recognized by Phillips v. Sheriff of Cook*

5    *Cty.*, 828 F.3d 541 (7th Cir. 2016); *Nat'l Fair Housing Alliance v. Fed. Nat'l Mortg. Ass'n*

6    *("Fannie Mae")*, 294 F. Supp. 3d 940, 947-48 (N.D. Cal. Mar. 21, 2018) (permitting local Fannie

7    Mae employees to decide which foreclosed properties to maintain was a cognizable policy under

8    disparate-impact theory).  Indeed, the district court in *County of Cook v. HSBC North America*

9    *Holdings* specifically found the complaint stated a disparate-impact claim in a similar case even

10   though much of HSBC's conduct was discretionary.  *See* 2018 WL 2431987, at *12.

11          In any event, Oakland has identified specific employment practices in addition to the mere

12   delegation of discretion.  For instance, WF allegedly incentivizes loan officers to sell more

13   expensive loans than that for which borrowers qualify, requires prepayment penalties that prevent

14   borrowers from refinancing HCHR loans, and fails to underwrite loans based on objective

15   underwriting criteria.  *See* FAC ¶¶ 39, 50.

16   D.    <u>Intentional Discrimination and Disparate-Impact Discrimination</u>

17          Finally, WF argues that allegations which suggest intentional discrimination, *see, e.g.*, *id.*

18   ¶¶ 44, 47, cannot state a claim for disparate impact, because they do not state a facially neutral

19   policy.  Mot. at 21 (quoting *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n.15

20   (1977)).  However, as *Watson* recognized, intentional acts of discrimination are often what cause

21   delegated discretion to have a disparate impact.  *See* 487 U.S. at 990 (policing intentional

22   discrimination by those with discretion is one reason that disparate-impact analysis applies to

23   policies of delegating discretion).  The two aspects of discrimination are not mutually exclusive.

24   *See also County of Cook v. HSBC North America Holdings*, 2018 WL 2431987, at *12 ("In fact,

25   one of the factors that a court considers to determine whether a plaintiff has made a *prima facie*

26   disparate impact case is 'the presence of some evidence of discriminatory intent, even if

27   circumstantial and less than sufficient to satisfy' the standards required for disparate treatment."

28   (citation omitted)).

E.      Conclusion

For the above reasons, Oakland successfully states a claim for disparate-impact discrimination.

### VIII.      CONCLUSION

For the reasons stated above, the motion to dismiss is **DENIED** as to the claims based on property-tax injuries.  The motion is also **DENIED** as to claims based on the municipal-expenditure injury insofar as they seek declaratory and injunctive relief.  The municipal-expenditure claims are **DISMISSED WITHOUT PREJUDICE** insofar as they seek damages.  Oakland's claims based on non-economic damages are **DISMISSED WITHOUT PREJUDICE**.

This order disposes of Docket No. 107.


**IT IS SO ORDERED**.


Dated: June 15, 2018

_____
EDWARD M. CHEN
United States District Judge