**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

| | |
|---|---|
| CITY OF OAKLAND, A Municipal Corporation, | No. 19-15169 |
| *Plaintiff-Appellee*, | D.C. No. 3:15-cv-04321-EMC |
| v. | |
| WELLS FARGO & COMPANY; WELLS FARGO BANK, N.A., | |
| *Defendants-Appellants.* | OPINION |

Appeal from the United States District Court
for the Northern District of California
Edward M. Chen, District Judge, Presiding

Argued and Submitted February 10, 2020
San Francisco, California

Filed August 26, 2020

Before:  R. Guy Cole, Jr.,[*] Ronald M. Gould, and
Mary H. Murguia, Circuit Judges.

Opinion by Judge Murguia

---

[*] The Honorable R. Guy Cole, Jr., United States Chief Circuit Judge for the U.S. Court of Appeals for the Sixth Circuit, sitting by designation.

## SUMMARY[**]

### Fair Housing

The panel affirmed in part and reversed in part the district court's partial grant and partial denial of a motion to dismiss for failure to state a claim in an action brought under the Fair Housing Act by the City of Oakland, alleging that Wells Fargo & Company and Wells Fargo Bank, N.A., engaged in discriminatory lending practices by issuing predatory loans to Black and Latino residents.

Oakland alleged that the predatory loans caused widespread foreclosures that reduced the City's property-tax revenues and increased its municipal expenses. The panel affirmed the district court's denial of Wells Fargo's motion to dismiss as to Oakland's claims for lost property-tax revenues and the district court's grant of Wells Fargo's motion to dismiss as to Oakland's claims for increased municipal expenses. The panel reversed the district court's denial of Wells Fargo's motion to dismiss as to Oakland's claims for injunctive relief, seeking to enjoin Wells Fargo from continuing to issue predatory home loans to Black and Latino borrowers.

The panel held that under *Bank of Am. Corp. v. City of Miami*, 137 S. Ct. 1296 (2017), to establish proximate cause under the FHA, a plaintiff must show some direct relation between the injury asserted and the injurious conduct alleged. Evaluating the contours of the FHA's proximate-

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

cause requirement, the panel reviewed the statute's text and legislative history and concluded that Congress clearly intended the nature of the statutory cause of action to be broad and inclusive enough to encompass less direct, aggregate, and city-wide injuries.  The panel also concluded that it was administratively feasible for the district court to administer the aggregate, city-wide injuries that Oakland claimed it suffered as a result of Wells Fargo's unlawful discriminatory lending practices throughout the City.

The panel held that the allegations in Oakland's amended complaint were sufficient to plead that its reduced property-tax revenues, but not its increased municipal expenses, were proximately caused by Wells Fargo's discriminatory lending practices.  Construing the amended complaint's allegations in the light most favorable to the City, including the City's proposed statistical regression analyses, the panel held that Oakland had plausibly alleged that its decrease in property-tax revenues had some direct and continuous relation to Wells Fargo's discriminatory lending practices throughout much of the City.

The further panel held that the FHA's proximate-cause requirement applies to claims for injunctive or declaratory relief.  Accordingly, the panel reversed the district court's conclusion that Oakland did not have to satisfy this requirement as to its claims for injunctive and declaratory relief.  The panel instructed that on remand, the district court should determine whether Oakland plausibly alleged that its ongoing injuries are being proximately caused by Wells Fargo's alleged wrongdoing.

**COUNSEL**

Neal Kumar Katyal (argued), Colleen Roh Sinzdak, Benjamin A. Field, and Sean Marotta, Hogan Lovells US LLP, Washington, D.C.; Paul F. Hancock and Olivia Kelman, K&L Gates LLP, Miami, Florida; Edward P. Sangster and Daniel W. Fox, K&L Gates LLP, San Francisco, California; Terry E. Sanchez, Munger Tolles & Olson LLP, Los Angeles, California; Bart H. Williams and Manuel F. Cachan, Proskauer Rose LLP, Los Angeles, California; for Defendants-Appellants.

Robert S. Peck (argued), Center for Constitutional Litigation P.C., Washington, D.C.; Barbara J. Parker, Oakland City Attorney; Maria Bee, Chief Assistant City Attorney; Office of the City Attorney, Oakland, California; Joel Liberson, Trial & Appellate Resources P.C., Torrance, California; Yosef Peretz and Ruth Israely, Peretz & Associates, San Francisco, California; for Plaintiff-Appellee.

D. Scott Change, Housing Rights Center, Los Angeles, California; Jamie Crook, American Civil Liberties Union Foundation of Northern California, San Francisco, California; David Loy, American Civil Liberties Union of San Diego & Imperial Counties, San Diego, California; Julia Devanthéry, American Civil Liberties Union of Southern California, Los Angeles, California; Sandra S. Park and Alejandro Ortiz, American Civil Liberties Union Foundation, New York, New York; Morgan Williams, National Fair Housing Alliance, Washington, D.C.; Ajmel Quereshi, NAACP Legal Defense & Education Fund Inc., Washington, D.C.; for Amici Curiae American Civil Liberties Union Foundation, American Civil Liberties Union Foundation of Northern California, American Civil Liberties Union Foundation of Southern California, American Civil

Liberties Union of San Diego & Imperial Counties, AARP, NAACP Legal Defense & Educational Fund Inc., National Fair Housing Alliance Inc., Poverty & Race Research Action Council, and Twelve Local Fair Housing Centers in the Ninth Circuit.

Dennis J. Herrera, City Attorney; Aileen M. McGrath, Co-Chief of Appellate Litigation; City Attorney's Office, San Francisco, California; for Amicus Curiae City and County of San Francisco.

Xavier Becerra, Attorney General; Michael L. Newman, Senior Assistant Attorney General; Christine Chuang, Supervising Deputy Attorney General; Shubhra Shivpuri and Srividya Panchalam; California Department of Justice, Oakland, California; for Amicus Curiae State of California.

## OPINION

MURGUIA, Circuit Judge:

Throughout our nation's history, racial and ethnic minorities—especially Black Americans—have been systematically denied one of the keys to the American dream: the opportunity to own a home. In 1967, during a pivotal period of civil unrest and reckoning with our country's history of segregation and racial injustice, President Lyndon B. Johnson established the National Advisory Commission on Civil Disorders (commonly known as the "Kerner Commission"). The Kerner Commission found that several government-sanctioned practices disadvantaged racial and ethnic minorities' fair access to housing, including rapid urbanization, the flight of White families to suburban neighborhoods, racially

restrictive covenants, real estate agents who steered homebuyers into racially homogenous areas, and discriminatory lending practices like redlining and reverse redlining. *See* Report of the National Advisory Commission on Civil Disorders 91 (1968) ("Kerner Commission Report"). To address housing segregation, the Kerner Commission recommended enactment of "a comprehensive and enforceable open-occupancy law making it an offense to discriminate in the sale or rental of any housing . . . on the basis of race, creed, color, or national origin." Kerner Commission Report at 263. After the assassination of Dr. Martin Luther King Jr., Congress heeded the Kerner Commission's recommendation and passed the Fair Housing Act of 1968 ("FHA" or the "Act") to ensure fair access to housing for racial minorities and other historically disadvantaged groups. The FHA has since been rightfully lauded as one of the greatest achievements of the civil rights movement.

Fifty years later, cities across our country began filing lawsuits under the FHA accusing the nation's largest banks of some of the same discriminatory lending practices that motivated Congress to pass the FHA in the first place. In the instant case, the City of Oakland ("Oakland" or the "City") alleges that Wells Fargo & Company and Wells Fargo Bank, N.A. (collectively, "Wells Fargo" or the "Bank") engaged in discriminatory lending practices by issuing predatory loans to its Black and Latino[1] residents, in violation of the FHA,

---

[1] This opinion uses the term "Latino" for purposes of simplicity to refer to all "person[s] of Latin American origin living in the [United States]." Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/Latino (last visited Aug. 17, 2020). It is also meant to include persons who identify as "Latina," "Latinx," or "Hispanic."

42 U.S.C. §§ 3604, 3605.   According to Oakland, the predatory loans caused widespread foreclosures that reduced the City's property-tax revenues and increased its municipal expenses.

Wells Fargo appeals the district court's partial denial of its motion to dismiss the City's complaint under Federal Rule of Civil Procedure 12(b)(6).   We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm in part and reverse in part.   We affirm the district court's denial of Wells Fargo's motion to dismiss as to Oakland's claims for lost property-tax revenues and the district court's grant of Wells Fargo's motion to dismiss as to Oakland's claims for increased municipal expenses.   We reverse, however, the district court's denial of Wells Fargo's motion to dismiss as to Oakland's claims seeking injunctive and declaratory relief and we remand for further proceedings consistent with this opinion.

## I.   Statutory Background.

The FHA makes it unlawful to "discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race."   42 U.S.C. § 3604(b).   More broadly, it makes it unlawful for "any person or other entity whose business includes engaging in residential real estate-related transactions to discriminate against any person in making available such a transaction, or in the terms or conditions of such a transaction, because of race[.]"   *Id.* § 3605(a).

The FHA established a private right of action for damages and injunctive relief.   *Id.* § 3613(c)(1).   The statute provides that an "aggrieved person may commence a civil action in an appropriate United States district court or State

court . . . to obtain appropriate relief with respect to [a] discriminatory housing practice[.]"  *Id.* § 3613(a)(1)(A). The Act in turn defines "aggrieved person" as any person who "claims to have been injured by a discriminatory housing practice; or believes that such person will be injured by a discriminatory housing practice that is about to occur." *Id.* §§ 3602(i)(1)–(2).  It is well established that the term "aggrieved person" under the FHA includes cities.  *Bank of Am. Corp. v. City of Miami* (*Miami I*), 137 S. Ct. 1296, 1306 (2017) ("[T]he City is an 'aggrieved person' able to bring suit under the statute.").

## II.  Factual background.[2]

According to Oakland, Wells Fargo engages in longstanding and ongoing discriminatory home lending practices[3] throughout the City, which result in redlining and reverse redlining.  Redlining is the practice of denying home loans to residents of minority neighborhoods.  Reverse redlining, by contrast, is the practice of issuing home loans to minority borrowers with significantly higher costs and more onerous terms than those offered to similarly situated

---

[2] The facts as presented are derived from Oakland's first amended complaint.

[3] Some of the discriminatory lending practices alleged in the amended complaint include steering minority borrowers into adjustable-rate loans instead of fixed-rate loans, failing to explain loan terms, and neglecting to provide loan brochures in Spanish.  Oakland also accuses Wells Fargo of having facially neutral policies that have an outsized negative effect on the terms of the loans extended to Black and Latino borrowers, including giving loan officers discretion and incentivizing them to offer high-risk and high-cost loans beyond what borrowers are qualified to handle.  The result is that loan officers often sell more expensive, higher-risk loan products to minority borrowers than to similarly situated White borrowers.

White borrowers—also known as "predatory loans." Predatory loans include, for example, subprime loans,[4] negative amortization loans,[5] "No-Doc" loans that require no supporting evidence of a borrower's income, loans with balloon payments, and "interest only" loans that carry a prepayment penalty.  According to Oakland, Wells Fargo not only issues predatory loans to its Black and Latino residents, but also refuses to refinance those loans even though it is willing to refinance the loans of similarly situated White residents.

Using Wells Fargo's own data,[6] Oakland employs a number of regression analyses[7] to show that its Black and

---

[4] A subprime loan has "an interest rate that is higher than a prime rate and is extended chiefly to a borrower who has a poor credit rating or is judged to be a potentially high risk for default."  Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/Subprime (last visited Aug. 17, 2020).

[5] A negative amortization loan "is one with a payment structure that allows for a scheduled payment to be made by the borrower that is less than the interest charge on the loan.  When that happens, deferred interest is created.  The amount of deferred interest created is added to the principal balance of the loan, leading to a situation where the principal owed increases over time instead of decreases."  Will Kenton, *Negatively Amortizing Loan*, Investopedia (Sept. 6, 2019), https://www.investopedia.com/terms/n/negativelyamortizingloan.asp  (last visited  Aug.  17, 2020).

[6] The City uses data Wells Fargo reports to local and federal authorities, which is available through public and private databases.

[7] A regression analysis is a statistical tool that focuses on the relationship between two or more variables of interest to ascertain the causal effect of one variable upon another.  *See* Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/regression%20analysis (last visited Aug. 17, 2020) (defining "regression analysis" as

Latino residents are more likely to receive predatory loans from Wells Fargo; that those predatory loans cause foreclosures; and that those foreclosures reduce property values and consequently diminish the City's property-tax revenues.  The City also alleges, albeit without statistical backing, that Wells Fargo's predatory loans increase its municipal expenses, forcing it to reduce its spending in fair-housing programs aimed at guaranteeing that all of its residents have equal access to safe and affordable housing.

### A. Black and Latino borrowers in Oakland are more likely to receive predatory loans from Wells Fargo.

The City's first set of regression analyses support its allegation that Wells Fargo issues predatory home loans to Black and Latino borrowers.  According to these studies, a Black Wells Fargo borrower is 2.403 times more likely to receive a predatory loan than a similarly situated White borrower.  A Latino Wells Fargo borrower is 2.520 times more likely to receive such a loan than a similarly situated White borrower.  Importantly, the first regression analysis controls for independent variables such as objective characteristics like credit history, loan-to-value ratio, and loan-to-income ratio that might contribute to a borrower receiving a predatory loan.  In fact, this discrepancy holds true even for more credit-worthy borrowers—Black and Latino borrowers with FICO scores above 660 are, respectively, 2.261 and 2.366 times more likely to receive

---

"the use of mathematical and statistical techniques to estimate one variable from another especially by the application of regression coefficients, regression curves, regression equations, or regression lines to empirical data").  Simply put, regression analyses examine the effect of one or more variables on a particular outcome.

predatory loans from Wells Fargo than similarly situated White borrowers.   Furthermore, borrowers in minority neighborhoods[8] in Oakland are 3.207 times more likely to receive a predatory loan than similarly situated borrowers in non-minority neighborhoods.  According to Oakland, these discrepancies between Black and Latino borrowers and their White counterparts are statistically significant.[9]

### B.  Wells Fargo's predatory home loans to Black and Latino borrowers cause foreclosures.

A second set of regression analyses using the same data shows that Black and Latino borrowers who receive predatory home loans from Wells Fargo are far more likely to have their homes foreclosed on than White borrowers who receive  non-predatory loans.   Taking  into  account  a borrower's race and objective risk characteristics[10] such as

---

[8] Oakland defines "minority neighborhoods" as neighborhoods with at least fifty percent Black or Latino households.  Conversely, Oakland defines "non-minority neighborhoods" as neighborhoods with at least fifty percent White households.

[9] According to the amended complaint, the probability that these discrepancies are random or coincidental is less than one percent.

[10] The other "objective risk" variables that the regression analysis accounts for include whether the loan had predatory terms, the borrower's credit score, the lien type (first or subordinate lien), the property type (single-family home, condo, coop, multifamily home, manufactured home, etc.), the loan purpose (purchase, cash-out refinance, rate-term refinance, etc.), the loan-to-value ratio, the combined loan-to-value ratio, the ratio of monthly loan payments to monthly income, the occupancy type (owner-occupied, second home, investment property), the month of loan origination, whether the loan became part of an agency or non-agency securitization, whether the loan was a conventional or an FHA/VA loan, whether the loan had an adjustable rate, and the property's neighborhood characteristics such as

credit history, loan-to-value ratio, and loan-to-income ratio, the results demonstrate that predatory home loans—which are disproportionately given to Black and Latino borrowers—are 1.753 times more likely to result in foreclosure. These studies also show that a Black Wells Fargo borrower who receives a predatory home loan is 2.573 times more likely to have their loan foreclosed than a White borrower who receives a non-predatory loan. Similarly, a Latino Wells Fargo borrower who receives a predatory home loan is 3.312 times more likely to have their home foreclosed than a White borrower who receives a non-predatory loan. In fact, 14.1 percent of Wells Fargo home loans issued in Oakland's minority neighborhoods resulted in foreclosure, as compared to only 3.3 percent of Wells Fargo home loans in non-minority neighborhoods. These discrepancies in foreclosure rates are also statistically significant.

## C. Foreclosures decrease property-tax revenues.

A third set of regression analyses, which use a technique known as "Hedonic regression,"[11] establishes that foreclosures caused by Wells Fargo's predatory loans reduce the value of both foreclosed properties and other properties nearby. Using routinely maintained property tax and other data, Oakland's statistical model isolates the lost property value attributable to Wells Fargo foreclosures and vacancies

---

the ratio of median income in the borrower's neighborhood to the median income in the metropolitan area, the share of homes in the neighborhood that are owner-occupied, and the median year in which homes in the neighborhood were built.

[11] Oakland explains that "Hedonic regression" is a technique that isolates the factors that contribute to the value of a property by studying thousands of transactions. Hedonic analysis determines the contribution of each of these factors to the value of a home.

caused by discriminatory lending from losses attributable to other causes.[12]  The Hedonic regression analysis also allows Oakland to calculate the impact on a given neighborhood's property values of the first foreclosure caused by a Wells Fargo predatory loan, the average impact of subsequent foreclosures, and the impact of the last foreclosure of this kind.  This loss can be isolated from any losses attributable to non-Wells Fargo foreclosures or other causes.  Therefore, according to Oakland, the Hedonic regression analysis precisely calculates the loss in property values in Oakland's minority neighborhoods that is attributable to foreclosures caused by Wells Fargo's predatory loans, which in turn can be used to calculate the City's corresponding loss in property-tax revenues.[13]

In sum, with the support of several regression analyses, Oakland alleges that Wells Fargo's discriminatory lending practices cause foreclosures that directly result in lower property values and attendant lower property tax revenues for the City.

---

[12] Other causes that might contribute to a home's value include, among other things, the size of the home, the number of bedrooms and bathrooms in the home, the relative safety of the neighborhood, and whether neighborhood properties are well maintained.

[13] The amended complaint cites to several academic studies that have successfully used Hedonic regression analyses to precisely calculate the loss of property value caused by predatory-loan-related foreclosures in Philadelphia and Los Angeles.  *See* Anne B. Shlay & Gordon Whitman, *Research for Democracy: Linking Community Organizing and Research to Leverage Blight Policy*, 5 City & Cmty. 105, 173 (2006); All. of Cals. for Cmty. Empowerment & Cal. Reinvestment Coal., *The Wall Street Wrecking Ball: What Foreclosures Are Costing Los Angeles Neighborhoods* 3 (2011).

### D. Foreclosures increased Oakland's municipal expenses and reduced spending in fair housing programs.

Oakland also alleges, without any regression analyses or other statistical support, that foreclosures caused by Wells Fargo's discriminatory lending practices increase municipal expenses because foreclosed properties require additional services such as police forces, firefighting, and safety code enforcement. According to Oakland, this increase in municipal expenses requires the City to divert resources that were otherwise intended for fair-housing programs designed to expand access to housing opportunities for Black and Latino residents.

### E. Procedural history.

Oakland sued Wells Fargo under the FHA to recover damages in the form of lost property tax revenues and increased municipal expenses and to enjoin Wells Fargo from continuing to issue predatory home loans to Black and Latino borrowers.

Wells Fargo moved to dismiss the original complaint, and the district court granted the motion only as to Oakland's unjust enrichment claim. Shortly thereafter, the Supreme Court granted a writ of certiorari in *Miami I*, which raised key standing and proximate causation questions directly relevant to this case. 137 S. Ct. at 1306. The district court subsequently stayed its proceedings until that case was decided. On May 1, 2017, the Supreme Court decided *Miami I*, prompting the district court to instruct Oakland to amend its complaint consistent with the Supreme Court's decision in that case.

Wells Fargo again moved to dismiss the amended complaint, challenging Oakland's ability to demonstrate proximate cause under the FHA for its alleged injuries using regression analyses.[14]   The district court granted Wells Fargo's motion to dismiss as to Oakland's claims that it suffered increased municipal expenses.   However, the district court denied Wells Fargo's motion to dismiss as to Oakland's claims that it suffered reduced property-tax revenues, and for declaratory and injunctive relief.

Wells Fargo then asked the district court to certify its order for interlocutory appeal pursuant to 28 U.S.C. § 1292(b).  The district court granted Wells Fargo's request, certifying two questions:  (1) whether Oakland's claims for damages based on the injuries asserted in the first amended complaint satisfy proximate cause required by the FHA on a motion to dismiss; and (2) whether the proximate-cause requirement articulated in *Miami I* is limited to claims for damages under the FHA and not to claims for injunctive or declaratory relief.

## III.    Standard of review.

"We review de novo a district court's dismissal for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6)."   *Putnam Family P'ship v. City of Yucaipa*, 673 F.3d 920, 924–25 (9th Cir. 2012) (citing *Decker v. Advantage Fund Ltd.*, 362 F.3d 593, 595–96 (9th Cir. 2004)).   "We likewise review de novo questions of

---

[14] In its motion to dismiss, and on appeal, Wells Fargo did not challenge Oakland's allegations that it engaged in discriminatory lending practices.  We express no opinion as to the plausibility or merit of those allegations.

statutory interpretation." *Id.* (citing *Aguayo v. U.S. Bank*, 653 F.3d 912, 917 (9th Cir. 2011)).

At the motion to dismiss stage, "we accept all factual allegations in the [amended] complaint as true and construe [them] in the light most favorable to [Oakland,] the nonmoving party." *Rowe v. Educ. Credit Mgmt. Corp.*, 559 F.3d 1028, 1029–30 (9th Cir. 2009) (quoting *Knievel v. ESPN*, 393 F.3d 1068, 1072 (9th. Cir. 2005)); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Furthermore, to survive a motion to dismiss, Oakland need only *plausibly allege* that Wells Fargo's actions proximately caused its injuries. *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514–15 (2002). The operative question is whether the amended complaint "contain[s] sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

## IV.    Proximate cause under the FHA.

We generally presume that a statutory cause of action is available only to plaintiffs whose injuries are proximately caused by violations of the statute. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 132 (2014). Therefore, we must first determine whether the FHA's proximate-cause requirement is sufficiently broad and inclusive to encompass Oakland's alleged aggregate,[15] citywide injuries.

---

[15] The term "aggregate" refers to the cumulative effect that Wells Fargo's alleged "pattern or practice of illegal and discriminatory mortgage lending" across thousands of individual loans has on the City's tax base and expenses.

### A.  General principles of proximate cause.

Proximate cause is designed to limit liability.  *Id.* ("For centuries, it has been 'a well established principle of [the common] law, that in all cases of loss, we are to attribute it to the proximate cause, and not to any remote cause.'" (alteration in original) (quoting *Waters v. Merchs.' Louisville Ins. Co.*, 36 U.S. (11 Pet.) 213, 223 (1837))).[16] Underpinning this bedrock legal principle is "the reality that 'the judicial remedy cannot encompass every conceivable harm that can be traced to alleged wrongdoing." *Id.* (quoting *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 536 (1983)).  We therefore assume that Congress is familiar with the longstanding common-law rule that loss must be attributable to its proximate cause and does not mean to displace this rule unless it does so expressly.  *Miami I*, 137 S. Ct. at 1305.  This is certainly true for the FHA, because "[t]he housing market is interconnected with economic and social life" such that violations of the statute "may, therefore, 'be expected to cause ripples of harm that flow' far beyond the defendant's misconduct."  *Id.* at 1306 (quoting *Associated Gen. Contractors*, 459 U.S. at 534).  Simply put, the purpose of the FHA's proximate-cause requirement is to limit recovery to more direct harms, because "[n]othing in the statute suggests that Congress intended to provide a remedy wherever those ripples travel."  *Id.*

There is no hard and fast rule for establishing proximate cause.  Far from being a one-size-fits-all "blackletter rule

---

[16] Importantly, proximate cause is not a requirement of Article III, but rather an element of the cause of action under a statute, and it "must be adequately alleged at the pleading stage in order for the case to proceed."  *Lexmark*, 572 U.S. at 134 n.6.

that will dictate the result in every case," the proximate-cause requirement varies by statute. *Holmes v. Secs. Inv'r Prot. Corp.*, 503 U.S. 258, 272 n.20 (1992) (quoting *Associated Gen. Contractors*, 459 U.S. at 536); *see also Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 654 (2008) ("Proximate cause . . . is a *flexible* concept." (emphasis added) (citing *Holmes*, 503 U.S. at 272 n.20)). As a result, the proximate-cause requirement is "controlled by the nature of the statutory cause of action." *Lexmark*, 572 U.S. at 133. Although proximate cause "is not easy to define," the basic inquiry is "whether the harm alleged has a *sufficiently close connection* to the conduct the statute prohibits. Put differently, the proximate-cause requirement generally bars suits for alleged harm that is 'too remote' from the defendant's unlawful conduct." *Id.* (emphasis added).[17]

The only controlling Supreme Court precedent on the FHA's proximate-cause requirement is its recent decision in *Miami I*. In that case, the City of Miami, like Oakland, claimed that Wells Fargo's and Bank of America's discriminatory lending practices caused Miami's decreased property-tax revenues and increased municipal expenses. *Miami I*, 137 S. Ct. at 1300–01. Reversing the Eleventh Circuit, the Court held that "to establish proximate cause under the FHA, a plaintiff must do more than show that its injuries foreseeably flowed from the alleged statutory

---

[17] With these principles in mind, the Supreme Court has defined the contours of the proximate-cause requirement of several other statutes, but not the FHA. *See, e.g.*, *id.* at 132–34 (Lanham Act); *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346 (2005) (Private Securities Litigation Reform Act); *Holmes*, 503 U.S. at 265–68 (Racketeer Influenced and Corrupt Organizations Act ("RICO")); *Associated Gen. Contractors*, 459 U.S. at 529–35 (Clayton Act).

violation."[18]  *Id.*  Rather, "*some direct relation* between the injury asserted and the injurious conduct alleged" is required.  *Id.* at 1306 (emphasis added) (quoting *Holmes*, 503 U.S. at 268).  "The 'general tendency' in these cases," the Court explained, "is not to go beyond the first step" of the causal chain.  *Id.* (quoting *Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 10 (2010)).  But what is included in this "first step" varies; it "depends in part on the 'nature of the statutory cause of action,' and an assessment 'of what is administratively possible and convenient.'"  *Id.* (first quoting *Lexmark*, 572 U.S. at 133; then quoting *Holmes*, 503 U.S. at 268).

The Supreme Court then declined to "draw the precise boundaries of proximate cause under the FHA and to determine on which side of the line the City's financial injuries fall."  *Id.*  Instead, it asked lower courts to weigh in by offering "the benefit of [their] judgment on how the contrary principles [of foreseeability and directness] apply to the FHA."  *Id.*[19]

---

[18] The Court also reaffirmed its well-established precedent that cities have statutory and Article III standing to sue under the FHA, noting that "the City's claimed injuries fall within the zone of interests that the FHA arguably protects.  Hence, the City is an 'aggrieved person' able to bring suit under the statute." *Miami I*, 137 S. Ct. at 1301.

[19] Since *Miami I* was decided, only the Eleventh Circuit and a handful of district courts have tackled this question.

On remand, the Eleventh Circuit held that Miami's use of statistical regression analyses—which are virtually identical to those used in Oakland's amended complaint—was sufficient to plausibly allege that the drop in Miami's property-tax revenues was proximately caused by Wells Fargo's redlining and reverse redlining.  *City of Miami v. Wells Fargo & Co.* (*Miami II*), 923 F.3d 1260, 1280 (11th Cir. 2019).

We are thus asked to decide the questions before us as a matter of first impression, guided by the two-step analysis laid out by the Supreme Court in *Miami I*:  first, we must evaluate "the contours of proximate cause under the FHA," and second, we "decide how that standard applies to the City's claim for lost property-tax revenue and increased municipal expenses." *Miami I*, 137 S. Ct. at 1306.  We now turn to each prong of this analysis.

## B. The contours of the FHA's proximate-cause requirement.

To determine the "contours" of a statute's proximate-cause requirement, we evaluate (1) the "nature of the statutory cause of action" and (2) what is administratively feasible. *Id* (quoting *Lexmark*, 572 U.S. at 133)*.*  In this case, both considerations lead us to confidently conclude that the

---

However, while Wells Fargo's petition for a writ of certiorari was pending before the Supreme Court, Miami asked the district court to dismiss that case.  Miami's request prompted the Supreme Court to grant Wells Fargo's petition for a writ of certiorari in a two-sentence order, vacating the Eleventh Circuit's opinion in *Miami II* as moot.  *Wells Fargo & Co. v. City of Miami*, 140 S. Ct. 1259 (2020) (citing *United States v. Munsingwear, Inc.*, 340 U.S. 36 (1950)).

Most of the district courts that have decided this issue agree that tax-related injuries suffered by cities as a result of banks' discriminatory lending practices fall within the FHA's proximate-cause requirement.  *See, e.g.*, *City of Sacramento v. Wells Fargo & Co.*, No. 2:18-cv- 416, 2019 WL 3975590, at *7 (E.D. Cal. Aug. 22, 2019); *City of Oakland v. Wells Fargo Bank N.A.*, No. 15-cv-4321, 2018 WL 3008538, at *9 (N.D. Cal. June 15, 2018); *City of Philadelphia v. Wells Fargo & Co.*, No. 17-2203, 2018 WL 424451, at *5 (E.D. Pa. Jan. 16, 2018).  *But see Prince George's County, Md. v. Wells Fargo & Co.*, 397 F. Supp. 3d 752, 762–63 (D. Md. 2019).

FHA's proximate-cause requirement is sufficiently broad and inclusive to encompass aggregate, city-wide injuries.

### i.   The nature of the statutory cause of action.

Evaluating the nature of the statutory cause of action in this case requires a close review of the FHA's text and legislative history to glean what Congress intended to be the scope of the statute's proximate-cause requirement.  *See Holmes*, 503 U.S. at 267 ("The key to the better interpretation [of a statute's proximate-cause requirement] lies in some statutory history.").   Oakland, and several friends of the court, persuasively argue that the text and legislative history of the FHA and its 1988 amendments indicate that Congress intended the scope of the statute's proximate-cause requirement to be far-reaching, and to include aggregate, city-wide injuries.

We begin with the text of the FHA, which reveals that Congress intended the statute to provide redress for a multitude of injuries that result from housing discrimination. Indeed, the FHA is widely considered one of the most capacious civil rights statutes, in large part due to its broad language.  For example, its first section declares that the law's purpose is "to provide, within constitutional limitations, for fair housing throughout the United States." 42 U.S.C. § 3601.  Unsurprisingly, the Supreme Court has interpreted "[t]he language of the Act [as] broad and inclusive," warranting "a generous construction" that allows claims from parties "act[ing] not only on their own behalf but also 'as private attorneys general in vindicating a policy that Congress considered to be of the highest priority.'" *Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205, 209, 211–12 (1972) (quoting Brief for the United States as Amicus Curiae, *id.* (No. 71-708), 1972 WL 136282, at *21).  Most relevant to this appeal is the FHA's broad definition of the

term "person aggrieved." Indeed, "[t]he definition of 'person aggrieved' contained in [the FHA] is in [its] terms broad, as it is defined as '*any* person who claims to have been injured by a discriminatory housing practice.'" *Id.* at 208 (emphasis added) (quoting 42 U.S.C. § 3602(i)(1)).

Other parts of the FHA also underscore that Congress intended its application to be very broad, beyond merely prohibiting discrimination in the sale or rental of housing. Surely, the FHA is most known for making it unlawful "[t]o refuse to sell or rent . . . or otherwise make unavailable or deny, a dwelling to any person because of race," and "[t]o discriminate against any person in the terms, conditions or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race." 42 U.S.C. § 3604(a)–(b). But the FHA also prohibits a host of other forms of insidious housing-related discrimination, such as publishing housing-related notices or advertisements with racial preferences, misrepresenting that a dwelling is not available to a person because of their race, and inducing a person to sell or rent a dwelling by making "representations regarding the entry or prospective entry into the neighborhood of a person or persons of a particular race." *Id.* § 3604(c)–(e).

As to the particular cause of action at issue in the instant case, the FHA prohibits "any person or other entity whose business includes engaging in residential real estate-related transactions to discriminate against *any* person in making available such a transaction, or in the terms or conditions of such a transaction," including in loans "for purchasing, constructing, improving, repairing, or maintaining a dwelling." *Id.* § 3605(a), (b)(1)(A) (emphasis added). Based on this far-reaching language, Congress clearly

intended the FHA to tackle discrimination throughout the real estate market.

Even though the text of the statute is sufficient to establish that Congress intended the FHA's proximate-cause requirement to be very broad, we also look at the FHA's legislative history to discern what Congress intended the statute's remedial aims to be, and whether aggregate, city-wide injuries fall within the scope of its proximate-cause requirement. *Cf. Blue Shield of Va. v. McCready*, 457 U.S. 465, 478 (1982) (analyzing "the relationship of the injury alleged with those forms of injury about which Congress was likely to have been concerned . . . in providing a private remedy under [the Clayton Act]"); *Associated Gen. Contractors*, 459 U.S. at 538 (reiterating the importance of legislative history in evaluating whether an injury "falls squarely within the area of congressional concern" in the context of the Sherman Act (quoting *Blue Shield*, 457 U.S. at 484)). The FHA's legislative history underscores that Congress intended the statute to reach beyond those individuals who are the immediate victims of direct discrimination, such as tenants, homebuyers, and home-loan borrowers. There is no doubt that Congress intended the statute to cover aggregate, city-wide injuries.

The Supreme Court discussed the legislative history of the FHA in *Trafficante*, where two tenants of an apartment complex sued their landlord because its race-based discrimination of potential non-White tenants deprived them of "the social benefits of living in an integrated community." 409 U.S. at 208. The Court explained that the legislative history of the FHA established that "[w]hile members of minority groups were damaged the most from discrimination in housing practices, the proponents of the legislation emphasized that those who were *not the direct objects of*

*discrimination* had an interest in ensuring fair housing, as *they too suffered*." 409 U.S. at 210 (emphases added). Citing to statements by United States senators who sponsored the bill, the Court held that "the whole community" is the "victim of discriminatory housing practices" under the FHA because "the reach of the proposed law was to replace the ghettos 'by truly integrated and balanced living patterns.'" *Id.* at 211 (quoting 114 Cong. Rec. 2706, 3422). Therefore, the Court read the FHA's legislative history in *Trafficante* to suggest that Congress intended the scope of the statute's proximate-cause requirement to reach, at the very least, beyond the immediate injuries suffered by individuals directly being discriminated against.

Our own review of the Congressional Record reveals that Congress enacted the FHA not only to address direct discrimination but also to reshape in meaningful ways the landscape of American cities. Indeed, the entire purpose of the statute was to target and reverse the large-scale insidious effects of discrimination, including racial and economic segregation within cities, suburban flight, and urban decay. We have no doubt that Congress was keenly focused on the impact that discriminatory housing practices, including discriminatory lending, were having on cities and their tax base. Congress therefore clearly intended the proximate-cause requirement of the FHA to reach neighborhood-wide and city-wide injuries.

For example, Senator Walter Mondale—who was the chief sponsor of the bill that eventually became the FHA—explained that the statute was intended to reform entire neighborhoods:

> [O]vert racial discrimination remains in one major sector of American life—that of

> housing. . . . [F]air housing is one more step toward achieving equality in opportunity and education . . . . The soundest, *long-range* way to attack segregated schools is to attack the segregated *neighborhood*. . . . [I]n truly integrated *neighborhoods* people have been able to live in peace and harmony—and both [Black persons] and [W]hites are the richer for the experience.

114 Cong. Rec. 3421, 3422 (Feb. 20, 1968) (emphases added).

Senator Edward Brooke—a co-sponsor of the FHA—underscored that the law's purpose was to help *cities* fight the economic and social problems that result from segregation. He asked, "[a]s segregation continues to grow . . . will not the *cities* which house the majority of the nation's industrial and commercial life find themselves less and less able to cope with their problems, *financially* and in every other way?" *Id.* at 2988 (Feb. 14, 1968) (emphases added).

Even more relevant to Oakland's claims, Senator Mondale specifically and repeatedly referenced cities' "declining tax base" as one of the large-scale injuries that the FHA was designed to mitigate. *Id.* at 2274 ("*Declining tax base*, poor sanitation, loss of jobs, inadequate educational opportunity, and urban squalor will persist as long as discrimination forces millions to live in the rotting cores of central cities." (emphasis added)). In no uncertain terms, he underscored that continued housing discrimination would "lead to the destruction of urban centers by loss of jobs and businesses to the suburbs, a *declining tax base*, and the ruin brought on by absentee ownership of property." *Id.* at 2993

(emphasis added). Therefore, he said, "[f]air housing legislation is a basic keystone to any solution of our present *urban crisis*." *Id.* 2275 (emphasis added).

Given the statutory text and the statements from the statute's sponsors—especially Senator Mondale's reference to a "declining tax base"—we have no difficulty concluding that Oakland's city-wide financial injury claims fall squarely within the FHA's intended purposes, which include helping cities fight the insidious and large-scale effects of housing discrimination on a neighborhood-wide and city-wide basis. *N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 526–27 (1982) (explaining that "remarks . . . of the sponsor of the language ultimately enacted[] are an authoritative guide to the statute's construction."); *Fed. Energy Admin. v. Algonquin SNG, Inc.*, 426 U.S. 548, 564 (1976) ("As a statement of one of the legislation's sponsors, this explanation deserves to be accorded substantial weight in interpreting the statute.").

Congress reiterated its commitment to a broad and inclusive application of the FHA when it revisited the statute in 1988. That year, Congress strengthened the FHA's enforcement mechanisms to "remov[e] barriers to the use of court enforcement by private litigants," noting that the FHA, up to that point, had "fail[ed] to provide an effective enforcement system." H.R. Rep. No. 100-711, at 13 (1988). *See generally* Fair Housing Amendments Act of 1988, Pub. L. No. 100-430, 102 Stat. 1619 (1988). These amendments "strengthen[ed] the private enforcement section by expanding the statute of limitations, removing the limitation on punitive damages," and updating the attorney's fees section to match similar sections in other civil rights statutes. H.R. Rep. No. 100-711, at 17. According to Senator Edward Kennedy—who sponsored the 1988 amendments—these changes were necessary because the FHA "proved to be an

empty promise because the legislation lacked an effective enforcement mechanism."  134 Cong. Rec. 10454 (1988). Undoubtedly, when Congress revisited the FHA in 1988, it expanded its reach and reiterated its broad and inclusive purpose.

Significantly, by the time Congress amended the FHA, the Supreme Court had long held in *Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 110–11 (1979), that cities had standing to sue under the FHA because "[a] significant reduction in property values [caused by racially discriminatory housing practices] directly injures a municipality by *diminishing its tax base*, thus threatening its ability to bear the costs of local government and to provide services."  (emphasis added).  Rather than overturn *Gladstone*, the House Report on the amendments explicitly states that the bill "*reaffirm[ed]* the broad holdings of [*Gladstone* and its progeny]."  H.R. Rep. 100-711, at 23 (emphasis added) (citing *Gladstone*, 441 U.S. at 91).  In no uncertain terms, Congress explicitly endorsed lawsuits by cities and municipalities under the FHA.  *Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.*, 135 S. Ct. 2507, 2520 (2015) ("Congress' decision in 1988 to amend the FHA while still adhering to the operative language in §§ 804(a) and 805(a) is convincing support for the conclusion that Congress accepted and ratified the unanimous holdings of the Courts of Appeals finding disparate-impact liability."); *see also Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 243 n.11 (2009) ("When Congress amended [the statute at issue] without altering the text of [the relevant provision], it implicitly adopted [the Supreme Court's] construction of the statute.").

After reviewing the FHA's text and legislative history, we conclude that Congress clearly intended the "nature of

the statutory cause of action" at issue in this case to be broad and inclusive enough to encompass less direct, aggregate, and city-wide injuries.

### ii. Administrative feasibility.

The Supreme Court also instructed us to consider "what is administratively possible and convenient" when deciding the contours of the FHA's proximate-cause requirement. *Miami I*, 137 S. Ct. at 1306 (quoting *Holmes*, 503 U.S. at 268). Administrative feasibility is important because "proximate cause 'generally bars suits for alleged harm that is "too remote" from the defendant's unlawful conduct.'" *Id.* (quoting *Lexmark*, 572 U.S. at 133 (quoting *Holmes*, 503 U.S. at 268–69). Therefore, when we decide what is "administratively possible," we typically ask whether a plaintiff's alleged injuries are "too remote" to satisfy the proximate-cause requirement of the statute at issue. *Holmes*, 503 U.S. at 268. In other words, to be administratively feasible, an indirect injury must have "some direct relation" to a defendant's violative conduct. *Id.*

The administrative feasibility analysis was outlined by the Supreme Court in its seminal decision in *Holmes*. In that case, the Supreme Court laid out three factors that govern whether an indirect injury is administratively feasible and convenient under a given statute: (1) whether it is possible to ascertain "a plaintiff's [indirect] damages attributable to the violation, as distinct from other, independent, factors"; (2) whether it is possible to "apportion[] damages among plaintiffs removed at different levels of injury from the violative acts, to obviate the risk of multiple recoveries"; and (3) whether allowing recovery for the indirect injury is "unjustified by the general interest in deterring injurious conduct, since directly injured victims can generally be counted on to vindicate the law as private attorneys general."

*Id.* at 269–70 (first citing *Associated Gen. Contractors*, 459 U.S. at 542–44; then citing *Blue Shield*, 457 U.S. at 473–75; then citing *Hawaii v. Standard Oil Co. of Cal.*, 405 U.S. 251, 264 (1972); and then citing *Associated Gen. Contractors of Cal., Inc.*, 459 U.S. at 541–42).  All three of these factors support a finding that at least some of Oakland's aggregate, city-wide injuries are administratively feasible and convenient under the FHA.

First, relying on its proposed statistical regression analysis, Oakland plausibly alleges that it can precisely calculate the exact loss in property values attributable to foreclosures caused by Wells Fargo's predatory loans, isolated from any losses attributable to non-Wells Fargo foreclosures or other independent causes, such as neighborhood conditions.  Although Oakland has not yet conducted this regression analysis or attached the results to its amended complaint, its explanation of the analysis in its pleadings is neither speculative nor conclusory.  In fact, the amended complaint explains in considerable length and meticulous detail exactly how it will conduct the regression analysis to quantify the loss in property values attributable to Wells Fargo's discriminatory lending.  The City also points to other studies that use the same methodology to produce the kinds of results that Oakland will need to rely on to prevail on the merits.  In other words, Oakland has offered much more than a purely formulaic recitation of how the FHA's causation requirement will be met—it has plausibly alleged a harm that is measurable using sophisticated, reliable, and scientifically rigorous methodologies.  *See Compton v. Countrywide Fin. Corp.*, 761 F.3d 1046, 1054 (9th Cir. 2014) ("To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face' . . . .  '[L]abels and conclusions' or 'a

formulaic recitation of the elements of a cause of action' do not suffice." (first quoting *Iqbal*, 556 U.S. at 678; and then quoting *Twombly*, 550 U.S. at 570)).    Therefore, taking Oakland's explanation of the regression analyses in its amended complaint as true, we hold that Oakland has plausibly alleged that it can calculate exactly which lost property-tax revenues are attributable to Wells Fargo's wrongdoing.

Second, there is no risk of duplicative recoveries in this case.    In the antitrust context, the Supreme Court has limited lawsuits to directly harmed individuals due to "the risk of duplicative recovery engendered by allowing every person along a chain of distribution to claim damages" from a single violation.    *Blue Shield*, 457 U.S. at 474–75.    Here, by contrast, individual borrowers cannot recover for Oakland's aggregate, city-wide injuries like reduced property-tax revenues or increased municipal expenses, which means there will be no need for the district court to apportion these damages between multiple plaintiffs.    Furthermore, the injuries to individual borrowers from Wells Fargo's predatory loans are completely independent, which means it is entirely possible to apportion the damages directly suffered by the individual borrowers from Oakland's damages.    In fact, in 2017, the Justice Department settled a separate nationwide lawsuit on behalf of individual borrowers against Wells Fargo for the higher borrowing costs and other harmful consequences associated with the same discriminatory lending practices at the core of this case.    *See* Consent Order, *United States v. Wells Fargo Bank N.A.*, No. 1:12-cv-01150 (D.D.C. Sept. 21, 2012), ECF No. 10.    No court would allow these borrowers to also recover a City's lost property-tax revenues.    *See, e.g.*, *Sacramento*, 2019 WL 3975590, at *7 (concluding that the City's alleged financial injuries, including lost property-tax revenues "are

unique and uniquely capable of vindication under the FHA").

Third, and finally, the fact that individual borrowers can sue Wells Fargo to vindicate their rights under the FHA does not mean that the City is unjustified in also doing so. Oakland's lawsuit in no way affects the ability of the individual borrowers to recover from Wells Fargo for the same discriminatory lending practices. The Supreme Court has primarily applied the third *Holmes* factor in the antitrust context, expressing "concern for the reduction in the effectiveness of those suits if brought by indirect purchasers with a smaller stake in the outcome than that of direct purchasers suing for the full amount of the overcharge." *Ill. Brick Co. v. Illinois*, 431 U.S. 720, 745 (1977). Of course, this assumes that more directly harmed parties have a larger stake in deterring wrongdoers, can sue for the entire harm caused by the alleged statutory violation, and will leave no "significant antitrust violation undetected or unremedied." *Associated Gen. Contractors*, 459 U.S. at 542. These assumptions hold true in antitrust cases where a price increase affects the distributor and the consumer in the exact same way—they both pay more. Housing discrimination, by contrast, affects different parties in different ways. In the instant case, for example, Oakland has an independent interest in deterring Wells Fargo and other banks from issuing predatory loans because individual borrowers cannot sue Wells Fargo to recover for the City's aggregate, city-wide injuries. Conversely, Oakland was not a part of and did not receive any funds from the $175 million settlement the Attorney General entered into with Wells Fargo in the aforementioned lawsuit brought on behalf of individual borrowers in the District of Columbia. Therefore, the City's lawsuit in no way "undermin[es] the effectiveness of [the individual borrowers'] suits," and vice versa. *Holmes*,

503 U.S. at 274 (quoting *Associated Gen. Contractors*, 459 U.S at 545).

Moreover, Oakland can better deter Wells Fargo's discriminatory lending practices because it can sue to remedy the Bank's systematic misconduct across thousands of home loans, whereas individual residents can only challenge the effects of the discriminatory lending policies on themselves.

In sum, all three of the *Holmes* factors support our conclusion that it is administratively feasible for the district court to administer the aggregate, city-wide injuries that Oakland claims it suffered as a result of Wells Fargo's unlawful discriminatory lending practices throughout the City.

## V.  Oakland's claims for monetary damages.

Having established the broad and inclusive contours of the FHA's proximate-cause requirement, we can now turn to the two questions the district court certified for interlocutory appeal.  First, we are asked to decide whether Oakland's claims for monetary damages based on the injuries asserted in the amended complaint—reduced property-tax revenues and increased municipal expenses—satisfy the FHA's proximate-cause requirement.  We hold that the allegations in the amended complaint are sufficient to plead that Oakland's reduced property-tax revenues, but not its increased municipal expenses, are proximately caused by Wells Fargo's discriminatory lending practices.

### A.  Reduced property-tax revenues.

Understanding the broad and inclusive nature of the FHA, as well as what is administratively feasible under the

statute, we hold that Oakland plausibly alleges that its decrease in property-tax revenue has some direct relation to Wells Fargo's predatory lending practices.

It is undisputed that Wells Fargo's alleged wrongdoing did not immediately cause Oakland's lost property-tax revenues. Far from being within the first step of the causal chain, the drop in Oakland's tax base is several steps removed from Wells Fargo's discriminatory lending practices.[20] However, these injuries are within the FHA's proximate-cause requirement because the City plausibly alleged that they have "a sufficiently close connection to the conduct the statute prohibits." *Lexmark*, 572 U.S. at 133. Of course, at summary judgment or trial, a judge or a jury will eventually have to decide whether, after discovery, Oakland adduced enough evidence that Wells Fargo's predatory lending more likely than not caused the City's reduced tax base.

Wells Fargo argues that, to satisfy proximate cause under *any* statute, a plaintiff must allege an injury that is the *immediate* result of an alleged statutory violation.[21] Such a

---

[20] The district court outlined the multiple causal steps between Wells Fargo's conduct and the City's financial injuries as follows: (1) the unlawful discrimination was carried out by Wells Fargo; (2) leading to default by the individual borrowers; (3) which in turn led to foreclosures; (4) which led to lower property values; and (5) consequently lower property-tax revenues for Oakland.

[21] Wells Fargo also offers two "rare" exceptions to its proposed categorical proximate-cause rule: (1) "where the most directly affected party cannot sue," or (2) "where a plaintiff alleges a harm at the second step that is as 'surely attributable' to the alleged statutory violation." But these circumstances are not "exceptions." They are *factors* that the Supreme Court has established, in cases like *Lexmark* and *Holmes*,

categorical proximate-cause requirement under the FHA would allow parties to recover only for injuries that are within the first step of the causal chain—in other words, only those who are immediately affected by discrimination.[22] Applying such standard to this case, Wells Fargo's liability would be limited to the individual borrowers directly harmed by the Bank's redlining and reverse redlining.

As an initial matter, Wells Fargo's categorical proximate-cause requirement is facially at odds with the Supreme Court's rule that "the *general tendency*" in proximate cause cases "is not to go beyond the first step" of the causal chain. *Miami I*, 137 S. Ct. at 1306 (emphasis added) (quoting *Hemi*, 559 U.S. at 10). The commonsense reading of "general tendency" is that in most cases, *but not all*, the proximate-cause requirement will be limited to the first step. Therefore, it cannot be that an intervening step automatically vitiates proximate cause. Indeed, Wells Fargo does not explain why, if the proximate-cause requirement under the FHA is as straight-forward and categorical as Wells Fargo suggests, the Supreme Court did not simply pronounce it as such in *Miami I*. If an intervening step alone is *always* enough to vitiate proximate cause, the Supreme

_____

should be considered when evaluating the contours of a particular statute's proximate-cause requirement.

[22] Importantly, Wells Fargo relies exclusively on civil RICO cases to support its argument that the FHA also requires a categorical first-step-only proximate-cause requirement. All these cases are distinguishable, however, because the Supreme Court has clearly held that RICO "should not get . . . an expansive reading," *Holmes*, 503 U.S. at 266, whereas the FHA is consistently and repeatedly interpreted broadly. *Compare Hemi.*, 559 U.S. at 9–10, *and Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 456 (2006), *with Trafficante*, 409 U.S. at 208–09, *and Inclusive Cmtys.*, 135 S. Ct. at 2516–26 (2015), *and Gladstone*, 441 U.S. at 103, *and Havens*, 455 U.S. at 372–75.

Court would not have sought the input of the lower federal courts.

Moreover, adopting Wells Fargo's categorical proximate-cause requirement would require this court to contravene decades of established Supreme Court precedent on standing under the FHA. Under Wells Fargo's proposed standard, its predatory lending practices can only proximately cause the injuries of its direct victims—the individual borrowers. But the Supreme Court has held, time and time again, that indirectly injured parties, including municipalities, have standing to sue under the FHA. *See Gladstone*, 414 U.S. at 100–09 (permitting the Village of Bellwood to sue realtors who discriminated against Black prospective homeowners even though the Village itself was not directly discriminated against); *Trafficante*, 409 U.S. at 212 (permitting tenants to sue their landlord for discriminating against prospective tenants even though the landlord had not discriminated against both plaintiffs directly); *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378–79 (1982) (permitting a fair housing organization to sue not only to address harm its members suffered but also to recover its own injuries). Under Wells Fargo's categorical proximate-cause requirement, none of the plaintiffs in *Gladstone*, *Trafficante*, or *Havens* would have been able to recover for the indirect injuries they suffered under the FHA. We decline Wells' Fargo's invitation to ignore the mandates of the Supreme Court.

In *Lexmark*, the Supreme Court in fact departed from the first-step "general tendency" standard, underscoring that an intervening step does not necessarily end proximate cause. In that case, the plaintiff was a manufacturer of components used by companies that refurbished Lexmark printer cartridges (the "remanufacturers"). *Lexmark*, 572 U.S.

at 121. It sued Lexmark, a printer and cartridge manufacturer, under the Lanham Act for misleading customers into believing that they were legally obligated to return spent cartridges to Lexmark. *Id.* at 120–23. The injury in that case was the plaintiff's lost revenue from consumers returning their spent cartridges to Lexmark rather than taking them to the remanufacturers to be refurbished. *Id.* at 123 In *Lexmark*, as here, there was more than one step in the causal chain: (1) Lexmark deceived consumers; (2) the consumers chose not to take their cartridges to the remanufacturers; and (3) those remanufacturers in turn bought fewer components from the plaintiff. Like Wells Fargo, Lexmark argued for a "categorical test permitting only direct competitors to sue for false advertising [under the Lanham Act]." *Id.* at 134.

Writing for a unanimous Court, Justice Scalia explained that an intervening step does not necessarily break the causal chain if there is *continuity* between the plaintiff's alleged injuries and the defendant's alleged misconduct. *Id.* at 139–40 . The Court concluded that the *Lexmark* plaintiff satisfied proximate cause under the Lanham Act because, although the causal chain "include[d] an intervening link of injury to the remanufacturers," there was no "'*discontinuity*' between the injury to the direct victim and the injury to the indirect victim, so that the latter is not *surely attributable* to the former (and thus also to the defendant's conduct), but might instead have resulted from 'any number of [other] reasons.'" *Id.* at 139–40 (emphases added) (quoting *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 458–59 (2006)). In other words, the plaintiff was able to demonstrate continuity: its injuries were directly related to the remanufacturers' injuries, which were in turn directly related to Lexmark's conduct.

In *Bridge*, a RICO case, the Supreme Court again focused on the continuity between the defendant's alleged violation and the plaintiff's indirect injury, not how many "steps" were in between. *See* 553 U.S. at 653–58. In that case, the plaintiffs were bidders participating in county-operated tax lien auctions. *Id.* at 642. They sued defendants—who were also bidders—for filing fraudulent documents that increased the defendants' chances of winning the auctions. *Id.* at 642–44. Again, there was more than one step in the causal chain: (1) the defendants filed fraudulent documents; (2) the county relied on the fraudulent documents; and (3) the plaintiffs lost the auction. *Id.* Nonetheless, the Court held that plaintiffs' injuries were proximately caused by the defendants' misconduct because "first party reliance" was not "necessary to ensure that there [was] a *sufficiently direct relationship* between the defendant's wrongful conduct and the plaintiff's injury." *Id.* at 657 (emphasis added). Although the Court framed its analysis in terms of reliance, the principle is the same—plaintiffs need not be the most immediate victims of a defendant's misconduct to satisfy proximate cause, as long as their injuries have some direct relation and are surely attributable to the misconduct.

Even though *Lexmark* and *Bridge* did not involve the FHA, the proximate-cause principles they establish squarely apply to this case. In *Lexmark*, "any false advertising that reduced the remanufacturers' business necessarily injured [the plaintiff] as well." *Lexmark*, 572 U.S. at 139. Similarly, in *Bridge*, the injury to the county necessarily injured the plaintiffs. The same is true here. Through sophisticated and well-explained statistical regression analyses, Oakland has plausibly alleged that the predatory loans issued by Well Fargo that caused injury to individual borrowers, namely in the form of foreclosures, also necessarily injured the City

because the foreclosures caused a respective drop in property values and in turn reduced property-tax revenues. Oakland achieves this by isolating the lost property value attributable to Wells Fargo's foreclosures, as opposed to other potential causes. In other words, if Oakland's Hedonic regression analysis operates as it is explained in the complaint, the same continuity the Supreme Court found in *Lexmark* and *Bridge* exists here.

In addition, Oakland's regression analyses plausibly and thoroughly account for other variables that might explain Oakland's reduced tax base, such that Oakland's injury can be surely attributed to Wells Fargo. This is especially true because Oakland's claims are aggregate, city-wide claims that are well-suited for data-driven statistical regression analyses. In this way, the City has established that there is some direct relation and continuity between its reduced property-tax revenues and Wells Fargo's predatory loans.

Wells Fargo attempts to distinguish *Bridge* and *Lexmark* by arguing that, unlike in those cases, there are more directly harmed persons who can bring suit here—the individual borrowers.[23] But individual borrowers often lack the financial incentive to pursue a lawsuit because their damages are much lower than the cost of prosecuting a lawsuit in federal court. Also, individual borrowers' lawsuits are often barred by the FHA's two-year statute of limitations because the harmful effects of predatory loans become apparent only years after the loans are issued. *See Garcia v. Brockway*, 526 F.3d 456, 461 (9th Cir. 2008) (en banc) ("[A]n aggrieved person must bring the lawsuit [under the FHA]

---

[23] Wells Fargo conveniently overlooks that there were more directly harmed parties that could have sued in both *Lexmark* and *Bridge*—the remanufacturers and the county, respectively.

within two years of either 'the occurrence . . . of an alleged discriminatory housing practice' or 'the termination of an alleged discriminatory housing practice.'" (quoting 42 U.S.C. § 3613(a)(1)(A))); *see also Thomas v. S.F. Hous. Auth.*, 765 F. App'x 368 (9th Cir. 2019) ("FHA claims are subject to two-year statute of limitations."); *Lopez v. Wells Fargo Bank N.A.*, 727 F. App'x 425, 426 (9th Cir. 2018) ("The district court properly dismissed [individual borrower's] . . . FHA . . . claim[] as barred by the applicable [two-year] statute[] of limitations."); *Cervantes v. Countrywide Home Loans, Inc.*, No. CV 09-517, 2009 WL 3157160, at *6 (D. Ariz. Sept. 24, 2009), *aff'd*, 656 F.3d 1034 (9th Cir. 2011) (finding that because Latino "[p]laintiffs obtained their loans in 2006 and brought [the] present action in March 2009. . . [their] claims fall outside the two-year time limitation").[24]

Additionally, cities and local governments are uniquely well-suited to bring aggregate lawsuits under the FHA to deter banks from engaging in widespread, large-scale discriminatory lending practices. Unlike individual borrowers, local governments have tools—including home-loan counseling programs for potential new homeowners, relocation programs for displaced tenants, eviction assistance programs, and a complaint system for alleged wrongful eviction and rent adjustments—that allow them to

---

[24] Oakland's amended complaint is not subject to the FHA's two-year statute of limitations because it challenges a larger and ongoing discriminatory practice. *See Garcia*, 526 F.3d at 461–62 ("[W]here a plaintiff, pursuant to the Fair Housing Act, challenges not just one incident of conduct violative of the Act, but an unlawful practice that continues into the limitations period, the complaint is timely when it is filed within [the statutory period, running from] the last asserted occurrence of that practice." (alteration in original) (quoting *Havens*, 455 U.S. at 380–81)).

detect illegal practices and patterns on a large, systematic scale. These tools allow cities—unlike individual borrowers—to discern a bank's pattern of discriminatory lending that becomes apparent once a critical mass of predatory home loans have been issued, and to generate statistical disparities to support an aggregate disparate-impact claim.

Wells Fargo also attacks the City's foreclosure regression on multiple fronts, none of which have merit. First, it argues that the regression is invalid because it assumes that a borrower defaults on a predatory loan because of the loan's high costs and onerous terms, and not because of well-recognized causes of foreclosure like job loss, medical hardships, or divorce.[25] Including these variables in the regression analysis would likely make no difference, however, because they are not correlated with the likelihood that a person will receive a predatory loan, especially because Wells Fargo argues that these life events happen *after* the borrower receives the predatory loan and before they stop making payments. *See* Daniel L. Rubinfeld, *Reference Guide on Multiple Regression*, *in* Reference Manual on Scientific Evidence 303, 315 (3d ed. 2011) ("Omitting variables that are not correlated with the variable of interest is, in general, less of a concern, because the parameter measures the effect of the variable of interest on the dependent variable is estimated without bias."). By arguing that these life events explain the discrepancy in foreclosure rates between minority and White borrowers,

---

[25] Oakland's amended complaint acknowledges that, due to data limitations, its current regression analysis does not control for every aspect of financial hardship that could plausibly affect the likelihood that someone defaults on a predatory loan, including job loss, medical hardship, or divorce.

Wells Fargo implies that minority borrowers are somehow more likely than White borrowers to get divorced, suffer from medical hardships, or lose their jobs.  Because this argument has no basis in law or common sense, we conclude that accounting for these life events would not increase the plausibility of the City's foreclosure regression analysis.  *See Bazemore v. Friday*, 478 U.S. 385, 400 (1986) (Brennan, J., joined by all other Members of the Court, concurring in part) ("While the omission of variables from a regression analysis may render the analysis less probative than it otherwise might be, it can hardly be said, absent some other infirmity, that an analysis which accounts for the major factors 'must be considered unacceptable as evidence of discrimination.'" (quoting *Bazemore v. Friday*, 751 F.2d 662, 672 (4th Cir. 1984))).

Second, Wells Fargo warns that allowing the City to plead its injuries using regression analyses would mean that every plaintiff going forward would be able to satisfy proximate cause under the FHA so long as she has a good statistician on hand.  We disagree.  A local corner store or flower shop—to use Wells Fargo's example—would be hard-pressed to design a regression analysis that could precisely account for its drop in revenues attributable to predatory-loan-related foreclosures.  What prevents any other private plaintiff from bringing a similar lawsuit is the principle, established in *Lexmark*, that what matters is whether Wells Fargo's wrongdoing "necessarily injured [Oakland] as well" as the individual borrowers in such a way that the individual borrowers were "not [a] 'more immediate victim[]'" than Oakland.  *Lexmark*, 572 U.S. at 140 (quoting *Bridge*, 553 U.S. at 658).  That principle is satisfied in the instant case because Oakland plausibly alleges how Wells Fargo's predatory loans to Black and Latino borrowers *necessarily* resulted in widespread foreclosures, which in

turn *necessarily* reduced property values, and thus *necessarily* reduced Oakland's property-tax revenues. A flower shop, by contrast, could lose revenues for a myriad of reasons, including the emergence of new competitors or an inexplicable drop in its customers' appetite for flowers, all of which would likely be impossible to quantify in a regression analysis. In this way, like in *Lexmark*, the City's injuries—unlike those of a local corner store or flower shop—also have "something very close to a 1:1 relationship" to Wells Fargo's predatory loans.

Finally, Wells Fargo unconvincingly argues that the Ninth Circuit has rejected the use of statistics to overcome the remoteness of a plaintiff's injury. It relies on *Oregon Laborers-Employers Health & Welfare Trust Fund v. Phillip Morris, Inc.*,[26] where this court held that the statistical model used by the plaintiff, a welfare fund, was speculative because it sought to establish that the fund's participants "*would have* allegedly quit smoking or begun smoking safer products, reducing their smoking-related illnesses, and thereby lowering the Funds' costs for reimbursing smokers' health care expenditures." 185 F.3d 957, 965 (9th Cir. 1999) (emphasis added) (quoting *Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.*, 171 F.3d 912, 929 (3d Cir. 1999)). The problem with the statistical analysis in *Oregon Laborers* was that—unlike Oakland's regression analysis here—it speculated about events that had not yet occurred. Indeed, the *Oregon Laborers* court even recognized that it would be "easy to ascertain" the "actual damages attributable to medical payments [already] made by

---

[26] Wells Fargo also relies on *Canyon County v. Sygenta Seeds, Inc.*, 519 F.3d 969 (9th Cir. 2008), which is completely inapposite because the plaintiffs in that case did not offer a statistical model or regression analysis to show proximate causation.

plaintiffs due to smoking-related injuries." *Id.* at 964. Therefore, *Oregon Laborers* does not support Wells Fargo's unfounded claim that the Ninth Circuit has rejected statistical evidence to plausibly plead proximate causation altogether.

In sum, construing the amended complaint's allegations in the light most favorable to the City, including its proposed statistical regression analyses, we hold that Oakland has plausibly alleged that its decrease in property-tax revenues has some direct and continuous relation to Wells Fargo's discriminatory lending practices throughout much of the City.

It is important to note that this case reaches us at the motion to dismiss stage, where Oakland has the burden of meeting a plausibility standard, not a reasonable probability or more-likely-than-not standard. *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 515 (2002) ("Rule 8(a) establishes a pleading standard without regard to whether a claim will succeed on the merits. 'Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test.'" (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)). In this regard, *Bazemore* is instructive:

> Whether, in fact, such a regression analysis does carry the plaintiffs' ultimate burden will depend in a given case on the factual context of each case in light of all the evidence presented by both the plaintiff and the defendant. However, as long as the court may fairly conclude, in light of all the evidence, that it is more likely than not that impermissible discrimination exists, the plaintiff is entitled to prevail.

478 U.S. at 400–01 (Brennan, J., joined by all other Members of the Court, concurring in part).

Therefore, even if we conclude today that the City has plausibly alleged that Wells Fargo's conduct proximately caused a reduction in its tax base, Oakland's allegations still need to be tested through discovery, including the rigors of expert rebuttal. For example, Wells Fargo argues that Oakland cannot attribute reduced property values in the Bay Area to foreclosures because California caps the annual property value increases at two percent. Even if proven true, this argument is only appropriate at the summary judgment or trial stages, when a trier of fact can evaluate competing evidence to determine if the two-percent cap undermines Oakland's regression analyses. *Iqbal*, 556 U.S. at 678 (holding that at the pleadings stage this court must look only at the allegations in the amended complaint to determine if they are sufficiently detailed to "state a claim for relief that is plausible on its face"). The City's regression analyses will be scrutinized during discovery and at trial before it can be determined that Wells Fargo's conduct more likely than not diminished the City's tax base. *Bazemore*, 478 U.S. at 400–01.

## B.  Increased municipal expenses.

Although Oakland plausibly alleges that Wells Fargo's discriminatory lending practices have some direct relation to its lost property-tax revenues, it fails to do the same for its increased municipal expenses. *Miami I*, 137 S. Ct. at 1306.

At the pleading stage, Oakland must do more than state, in conclusory fashion, its theory of how foreclosures caused by Wells Fargo's predatory loans proximately caused additional municipal expenses. *Iqbal*, 556 U.S. at 678 ("[T]he tenet that a court must accept as true all of the

allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." (citing *Twombly*, 550 U.S. at 555)). Without more, the district court cannot precisely ascertain which increases in municipal expenses are attributable to foreclosures caused by Wells Fargo's predatory loans to Black and Latino residents. Obviously, the *entire* increase in Oakland's municipal expenses over the relevant time period cannot be attributed to Wells Fargo's alleged predatory lending practices. Because Oakland has not accounted for other independent variables that might have contributed to or even caused the spike in expenses, its claim of increased municipal expenses fails the first *Holmes* factor, which requires Oakland to plausibly plead that it is possible to ascertain with precision what increase in municipal expenses is attributable to Wells Fargo's misconduct. 503 U.S. at 269.

Accordingly, Oakland's conclusory proximate-cause allegations as to its alleged increased municipal expenses are implausible and the district court did not err in dismissing them.

## VI.     Oakland's claims for injunctive and declaratory relief.

The district court also asked us to decide whether the FHA's proximate-cause requirement applies to claims for injunctive or declaratory relief. We hold that it does. The district court was apparently mistaken in its reading of *Miami I* and other Supreme Court precedents clearly establishing that plaintiffs must satisfy the proximate-cause requirement to receive *any* form of relief. 137 S. Ct. at 1305–06. Oakland does not dispute this point of law on appeal.

In *Miami I* the Supreme Court noted that claims for statutory damages are analogous to common law tort actions, and therefore courts "repeatedly applied directness principles to statutes with 'common-law foundations.'" 137 S. Ct. at 1306 (quoting *Anza*, 547 U.S. at 457). In doing so, the Court simply established that statutes with common law foundations require a showing of proximate cause. But nowhere in that opinion does the Court state that it requires plaintiffs to allege proximate cause *only* for *damages* claims under those statutes. In fact, the Supreme Court does not even mention declaratory or injunctive relief, let alone hold that proximate cause is not required to receive such relief. *See generally*, *id.*

Furthermore, in *Lexmark*, the Supreme Court was unequivocal that "[p]roximate causation is . . . an element of the cause of action under the statute." 572 U.S. at 134 n.6. It specifically underscored that "proximate causation . . . must be met in *every* case," even if the plaintiff is not entitled to damages, because "it may still be entitled to injunctive relief." *Id.* at 135 (emphasis added). Therefore, the Court applied its proximate-cause reasoning generally to the plaintiff's false advertising claim without making any distinction based on the type of relief, even though the plaintiff sought both damages and injunctive relief. *See id.* at 123, 137.

Not surprisingly, almost every other court that has reviewed analogous FHA claims in the wake of *Miami I* has also applied proximate-cause principles to cities' claims without making any distinction between damages and injunctive relief. *See, e.g.*, *Miami II*, 923 F.3d at 1268 (applying proximate cause where "[t]he City also asked for a declaratory judgment stating that the Banks' conduct violated the FHA, [and] an injunction barring the Banks

from engaging in similar predatory conduct"); *Sacramento*, 2019 WL 3975590, at *2 (applying proximate cause where "[t]he City seeks declaratory and injunctive relief and damages"); *Philadelphia*, 2018 WL 424451, at *1 (applying proximate cause where plaintiff sought an injunction prohibiting further discriminatory conduct). *But see Prince George's County.*, 397 F. Supp. 3d at 765 ("[T]o the extent that the Counties are seeking injunctive or declaratory relief against Defendants' alleged equity-stripping practices, the proximate-cause requirement being less strict, the Counties may proceed." (citing *Oakland*, 2018 WL 3008538 at *12)).

Accordingly, we reverse the district court's conclusion that Oakland did not have to satisfy the FHA's proximate-cause requirement as to its claims for declaratory and injunctive relief.  On remand, the district court should determine whether Oakland plausibly alleged that its ongoing injuries are being proximately caused by Wells Fargo's alleged wrongdoing.

## VII.    Conclusion.

We affirm the district court's denial of Wells Fargo's motion to dismiss as to Oakland's claims for lost property-tax revenues and the district court's grant of Wells Fargo's motion to dismiss as to Oakland's claims for increased municipal expenses.  We reverse, however, the district court's denial of Wells Fargo's motion to dismiss as to Oakland's claims for injunctive and declaratory relief and we remand for future proceedings consistent with this opinion.

**AFFIRMED in part; REVERSED in part; and REMANDED.  Each party shall bear its own costs.**